UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re:<br>DAVID W. CHARRON,<br>        Debtor. | Case No. 14-07970<br>Chapter 7<br>Honorable James W. Boyd |
| GLENN S. MORRIS and THE GLENN S. MORRIS TRUST,<br>        Plaintiffs,<br>v.<br>DAVID W. CHARRON,<br>        Defendant. | Adversary Proceeding No. _____ |

## GLENN S. MORRIS'S COMPLAINT OBJECTING TO DISCHARGE

Plaintiff Glenn S. Morris, individually and as trustee for the Glenn S. Morris Trust (collectively, "Morris"), by his attorneys, Miller, Canfield, Paddock and Stone, P.L.C., alleges as follows for his Complaint.

## JURISDICTION

1. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1334 and 157.

2. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I), arising under title 11 of the United States Code, and arising in the above-captioned case under chapter 7 of the Bankruptcy Code, now pending in this Court.

3. Morris consents to entry of a final order or judgment by this Court.

## GENERAL ALLEGATIONS

4. David W. Charron ("Charron") filed a petition for relief under chapter 7 of the United State Bankruptcy Code on December 31, 2014.

**Charron's Debt to Morris**

5. Charron is indebted to Morris in the amount of no less than $341,063.00 ("Claim").

6. The Claim is evidenced by (1) a finding of civil contempt against Charron ("Contempt Opinion") entered on December 27, 2012, in Case Number 07-6441-CR ("State Court Case") in the 17th Circuit Court for Kent County, Michigan ("State Court"); (2) an opinion awarding attorneys' fees and costs in favor of Morris and against Charron ("Attorney Fee Opinion") in the State Court Case in the amount of $363,506.77, dated January 28, 2014; and (3) a final judgment for Morris and against Charron in the amount of $363,506.77, entered in the State Court Case on March 7, 2014 (the "Final Judgment"; and collectively with the Contempt Opinion and the Attorney Fee Opinion, the "Contempt Ruling"). The Contempt Opinion is attached as Exhibit A; the Attorney Fee Opinion is attached as Exhibit B; and the Final Judgment is attached as Exhibit C.

7. The amount awarded to Morris pursuant to the Contempt Ruling is partially offset by a judgment in favor of Charron and against Morris entered on January 28, 2014, in the amount of $22,443.77 in Case Number 09-01878-CB in the State Court, pursuant to Michigan's offer of judgment rule ("Offer of Judgment Opinion"). The Offer of Judgment Opinion is attached as Exhibit D.

8. The Final Judgment explicitly references the Attorney Fee Opinion and the Offer of Judgment Opinion.

9. Taken together, the $363,506.77 Contempt Ruling against Charron and the $22,443.77 Offer of Judgment Opinion in Charron's favor net to $341,063.00, the amount of the Claim.

**Charron's Debt to Morris, as Reflected on Charron's Bankruptcy Filings**

10. Charron lists $344,706.40 as the amount of the Claim on Schedule F as filed on January 28, 2015. (Doc. No. 13, page 20 of 47.)

11. By checking the corresponding boxes on his Schedule F, Charron has declared that the amount he owes to Morris is unliquidated and contingent.

12. The amount Charron owes Morris was liquidated by the State Court by the Contempt Ruling and the Offer of Judgment Opinion.

13. Charron's appeal to the Michigan Court of Appeals ("Appellate Court") resulted in, among other things, affirmation of the State Court's Contempt Ruling. *Morris v. Schnoor*, Nos. 315006, 315007, 315702, and 315742, 2014 WL 2355705 (Mich. Ct. App. May 29, 2014) ("Appellate Case").

14. The Michigan Supreme Court declined to hear Charron's appeal of the Appellate Court's affirmation of the Contempt Ruling. *Morris v. Schnoor*, 859 N.W.2d 514 (2015).

15. On his amended schedule B, filed on March 23, 2015, Charron admits that all appeals regarding the Contempt Ruling are complete. (Doc. No. 24, page 5 of 7.)

16. All appeals of the Contempt Ruling are complete.

17. No further acts or events are required for Charron to be liable to Morris for the Claim.

**The Relationship Between Morris, Charron, and Schnoor**

18. Prior to 2007, Morris and R. Judd Schnoor ("Schnoor") were principals in Morris, Schnoor & Gremel, Inc. ("MSG"), an insurance agency formed in 1980 by Morris's father. Contempt Opinion at 2.

19. MSG was sold to Schnoor and Morris in the 1990s. *Id.*

20. Morris and Schnoor each developed businesses other than MSG. *Id.*

21. Charron was the attorney for various entities controlled by Morris and Schnoor. *Id.*

22. In 2005, Schnoor or entities controlled by him were involved in various construction projects. *Id.*

23. To help finance construction costs for these projects, Schnoor began using lines of credit available to various entities that he controlled with Morris. *Id.*

24. In December, 2006, Morris, Schnoor, and Charron met "to address concerns about the flow of money and credit" among Morris's and Schnoor's business ventures. *Id.*

25. Morris and Schnoor did not resolve their disagreements at the December, 2006, meeting. *Id.*

26. In April, 2007, the parties exchanged proposals in an attempt to negotiate a resolution, but again were unable to reach a resolution. *Id.*

**Commencement of the State Court Case and Morris's Sale of His MSG Stock**

27. In July, 2007, Morris filed the State Court Case seeking dissolution of MSG. *Id.*

28. After some time, the State Court entered an order directing Morris to sell his stock in MSG to Schnoor for $2.5 million. *Id.*

29. Morris sold his stock in MSG to Schnoor pursuant to the State Court's order. *Id.* at 2-3.

30. As part of the sale transaction, Schnoor made a down payment of $235,804.00 to Morris and signed a promissory note to Morris in the amount of $2,264,196 (the "Note"). *Id.* at 3.

31. Under the terms of the State Court-ordered stock sale, Morris retained a secured interest in the stock of MSG, but not in its assets. *Id.*

32. Schnoor made a few payments to Morris under the Note, then ceased making payments under the Note in the spring of 2008. *Id.*

33. Schnoor asked the State Court to excuse him from making payments pursuant to the Note. *Id.*

34. The State Court did not excuse Schnoor from making payments pursuant to the Note. *Id.*

### Schnoor's Contempt Hearing

35. On August 20, 2008, the State Court began a hearing to determine whether Schnoor should be held in contempt of court for failure to make payment under the Note as ordered by the State Court. *Id.*

36. At the end of the August 20, 2008, State Court hearing, the parties to the hearing agreed to entry of a temporary restraining order preventing the transfer of MSG's assets outside the ordinary course of business. *Id.* at 3-4.

37. On August 22, 2008, the State Court entered an order, stating "that Defendant R. Judd Schnoor shall not transfer assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court to do so" ("Restraining Order"). *Id.* at 4. A copy of the Restraining Order is attached as Exhibit E.

38. On September 2, 2008, the State Court noted that the Restraining Order was to "continue until further order of the Court." *Id.*

39. No objections were made to the Restraining Order. *Id.*

### Transfer of MSG's Assets in Violation of the Restraining Order

40. Despite the Restraining Order, on or around August 28, 2008, Charron and Schnoor began working to transfer MSG's assets to a buyer to them. *Id.* at 4-5.

41. The buyer ultimately chosen by Charron and Schnoor was New York Private Insurance Agency, LLC ("NYPIA"). *Id.* at 5.

42. NYPIA was formed shortly before it purchased the assets of MSG. *Id.* at 6.

43. Charron intended that, notwithstanding the Restraining Order, MSG's assets would be sold to NYPIA. *Id.*

44. Charron intended that, by the sale of MSG's assets to NYPIA, the MSG stock in which Morris held a secured interest would be rendered completely worthless. *Id.* at 5-6.

45. On May 7, 2008, Charron sent an email to counsel for Morris, reminding him that Morris "does not hold any security interest with [MSG], as alleged by your letter. Mr. Morris' security is and has always been limited to the agency stock . . ." *Id.* at 5 n.5.

46. To facilitate the sale of MSG's assets to NYPIA, Charron's law firm, Charron & Hanisch, P.L.C. ("C&H") served as a middleman in its capacity as a secured creditor of MSG. *Id.* at 6.

47. NYPIA and C&H executed an asset purchase agreement on November 7, 2008, so that NYPIA could purchase MSG's assets. *Id.*; Asset Purchase Agreement, Exhibit F.

48. Acting upon a security agreement from May 22, 2008, that granted C&H a secured interest in the assets of MSG, C&H was to take possession of MSG's assets, then sell them to NYPIA. Contempt Opinion at 6.

49. On November 21, 2008, C&H took possession of MSG's assets and sold them to NYPIA for $395,000, as evidenced by a bill of sale. *Id.*; Bill of Sale, Exhibit G.

50. Both the Asset Purchase Agreement and the Bill of Sale include in the property transferred "all claims and awards in the causes of action presently pending in Kent County

Circuit Court Case No, 07-06441-CR, Morris v. Schnoor, et. al.," which is the State Court Case. See Exhibit A to Asset Purchase Agreement, Bill of Sale.

51. On November 21, 2008, when MSG's assets were transferred to NYPIA, the Restraining Order remained in full effect. Contempt Opinion at 6.

52. Charron knew that the sale of MSG's assets violated the Restraining Order. *Id.* at 6-7.

53. In December, 2008, Morris's counsel raised concerns regarding the transfer of MSG assets with Charron. *Id.* at 7.

54. Charron told Morris's counsel via email that the Restraining Order remained in effect and prohibited the transfer of any of MSG's assets (the "December Email"). *Id.*

55. In the December Email, Charron told Morris's counsel, "If you believe he [Schnoor] has violated the [Restraining O]rder, let's have a shoot out so we may disclaim you of the notion." *Id.*

56. As the time Charron sent his December Email, all of MSG's assets had already been sold by C&H to NYPIA. *Id.*

57. The December Email was a false representation on Charron's part. *Id.*

58. The December Email shows that Charron knew that C&H's sale of MSG's assets was improper. *Id.*

59. The December Email shows that Charron knew that C&H's sale of MSG's assets was prohibited by the Restraining Order. *Id.* at 8.

### Commencement of Charron's Contempt Proceedings

60. A month later, on January 21, 2009, Morris learned that the assets of MSG had been transferred to NYPIA. Attorney Fee Opinion at 5.

61. On or around November 17, 2009, Morris asked the State Court to hold Charron in contempt for violating the Restraining Order and for orchestrating the transfer of MSG's assets to NYPIA. *Id.* at 6.

62. Morris incurred costs and fees of over $550,000 as a result of Charron's violation of the Restraining Order and for orchestrating the transfer of MSG's assets to NYPIA. *Id.* at 9 n.6.

## The State Court Contempt Hearing

63. The Start Court held a hearing to determine whether Charron's actions, as set forth in paragraphs 18 through 59, and further detailed in the Contempt Ruling and the Appellate Case, demonstrated that Charron should be held in contempt. Contempt Opinion at 1-7.

64. The State Court explicitly made findings of fact in its Contempt Ruling upon which the allegations of paragraphs 18 through 59 are based. *Id.* at 8.

65. The State Court applied a stringent standard—the clear and convincing standard—in its determination that Charron should be held in contempt. *Id.* at 10.

66. The State Court found that there was clear and convincing evidence that Charron

   (a) had knowledge of the Restraining Order and its terms. *Id.* at 15.

   (b) committed "a textbook example of contempt of court," in that he "recognized that a court order prohibited all transfers of MSG's assets outside the ordinary course of business . . . yet took actions on behalf of his client (MSG) and his own law firm that did precisely what the court order forbade." *Id.*; Attorney Fee Opinion at 2.

   (c) "siphoned all of the assets of MSG through his law firm and passed them on to NYPIA" in violation of the Restraining Order. Contempt Opinion at 15.

   (d) recognized the impropriety of his conduct. *Id.* at 16.

(e) "acted in contempt of the [Restraining Order] entered on August 22, 2008." *Id.*; Attorney Fee Opinion at 2.

67. The State Court found the actions of C&H, Charron's law firm which he controlled, and MSG caused Morris damages in the amount of $1,368,000. Contempt Opinion at 12-14, 17-19.

68. As a result, on December 27, 2012, the State Court awarded Morris $1,368,000, to be collected jointly and severally from C&H and from MSG. *Id.*

69. That day, December 27, 2012, Charron faxed a dissolution certificate to the Michigan Department of Licensing and Regulatory Affairs, which filed it the following day. Certificate of Dissolution, Exhibit H.

70. Charron dissolved C&H because the State Court entered the Contempt Opinion.

71. The State Court also found that Charron's actions had caused Morris damages in having to pursue contempt sanction against Charron. *Id.* at 16, 21.

72. The State Court closely examined Morris's request for attorneys' fees and costs, and reduced it to the amount allowable under Michigan state law. Attorney Fee Opinion at 5-11.

73. As a result, on December 27, 2012, the State Court awarded Morris a portion of the costs and attorneys' fees that Morris incurred in pursuing the contempt sanction against Charron. *Id.*

74. On January 28, 2014, the State Court found Charron liable for "$349,416 in attorney fees and $14,090.77 in court costs to Morris." Attorney Fee Opinion at 11.

75. The State Court's award for costs and attorneys' fees is the basis for the Claim.

### COUNT I – Willful and Malicious Injury
### (Bankruptcy Code Section § 523(a)(6))

76. Morris restates all prior allegations.

77. Title 11, section 523(a)(6) of the United States Code states in relevant part that "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity."

78. The Sixth Circuit has held that a "willful and malicious injury by the debtor" occurs when the debtor either desires to cause an injury by his actions or else believes that an injury is substantially certain to result from his actions." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).

79. When a debtor disobeys a clear order of a court issued to preserve assets, resulting in the dissipation of the assets to be protected, the damages that result from the debtor's disobedience are not dischargeable. *Musilli v. Droomers (In re Musilli)*, 379 Fed. Appx. 494 (6th Cir. 2010).

80. All actions taken by C&H with respect to the transfer of MSG's assets were orchestrated by Charron, C&H's principal.

81. Charron is responsible for C&H's actions with respect to the transfer of MSG's assets.

82. At the time Charron effected the transfer of MSG's assets through C&H and ultimately to NYPIA, Morris held a security interest in MSG's stock.

83. Charron's transfer of MSG's assets to NYPIA through C&H rendered MSG's stock essentially worthless.

84. Charron's transfer of MSG's assets to NYPIA through C&H rendered Morris's security in MSG's stock essentially worthless.

85. Charron knew that by transferring MSG's assets to NYPIA, it was substantially certain that MSG's stock would be rendered essentially worthless.

86. Charron knew that by transferring MSG's assets to NYPIA, it was substantially certain that Morris's security interest in MSG's stock would be rendered essentially worthless.

87. The State Court issued the Restraining Order to protect MSG's assets and Morris's security interest in MSG's stock.

88. Charron knew that the purpose of the Restraining Order was to protect MSG's assets and Morris's security interest in MSG's stock.

89. Charron knew that by violating the Restraining Order, it was substantially certain that MSG's stock and Charron's interest in MSG's stock would be rendered essentially worthless.

90. Charron intended injury to Morris's security interest in MSG's stock when he transferred MSG's assets to NYPIA in violation of the Restraining Order.

91. Charron realized that, as a result of his transfer of MSG's assets to NYPIA in violation of the Restraining Order, it was substantially certain that Morris's security interest in MSG's stock would be rendered essentially worthless.

92. Charron willfully and maliciously caused injury to Morris's security interest in MSG's stock.

93. Morris's security interest in MSG's stock constitutes a property interest.

94. Charron thus willfully and maliciously caused injury to Morris's property.

95. Charron realized that it was substantially certain that Morris would incur litigation costs as a result of Charron's and C&H's transfer of MSG's assets to NYPIA in violation of the Restraining Order.

96. Charron willfully and maliciously caused injury to Morris's property by forcing Morris to incur litigation costs which would have been unnecessary but for Charron's actions in violation of the Restraining Order.

97. Because Charron willfully and maliciously caused injury to Morris's property, Charron is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6).

WHEREFORE, Morris asks the Court to deny Charron a discharge of the debt owed to Morris in the amount of $341,063.00 plus all allowable interest, costs, and attorneys' fees, and to grant such further relief as may be just.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Ronald A. Spinner
Stanley J. Stek (P29332)
Eric D. Carlson (P60277)
Ronald A. Spinner (P73198)
Attorneys for Creditor Glenn S. Morris
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 496-7829
spinner@millercanfield.com

Dated: April 10, 2015