**EXHIBIT A**

**THE CONTEMPT OPINION**

STATE OF MICHIGAN
IN THE 17th CIRCUIT COURT FOR KENT COUNTY

GLENN S. MORRIS and THE GLENN S.
MORRIS TRUST,

          Plaintiffs/Counter-Defendants,

               Case No. 07-06441-CR

   vs.

               HON. CHRISTOPHER P. YATES

R. JUDD SCHNOOR and MADCAP
ENTERPRISES, LLC, substituting in for
MORRIS, SCHNOOR & GREMEL, INC.,

          Defendants/Counter-Plaintiffs.

_____/

OPINION AND ORDER SETTING FORTH FINDINGS OF CIVIL CONTEMPT

     In this civil action involving a venerable West Michigan insurance agency, the Court issued

an order on August 22, 2008, directing "that Defendant R. Judd Schnoor shall not transfer assets of

Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from

the Court." While that order was in force, Mr. Schnoor, his attorney David W. Charron, and the law

firm Charron & Hanisch, P.L.C. ("C&H") engaged in a transaction that resulted in the transfer of the

assets of Morris, Schnoor & Gremel, Inc. ("MSG") to New York Private Insurance Agency, LLC,

("NYPIA") in violation of the court order. On May 19, 2011, the Court ordered Mr. Schnoor, MSG,

Attorney Charron, C&H, and NYPIA to show cause why they should not be held in civil contempt

of court for violating the order. The Court conducted a hearing and permitted the parties to present

arguments. This opinion sets forth findings of fact, conclusions of law, and the Court's ruling that

MSG, Attorney Charron, and C&H – but not NYPIA – must be held in civil contempt of court.[1]

_____

[1] Judd Schnoor filed for bankruptcy on January 28, 2009, see Plaintiffs' Exhibit 447, and so
Glenn Morris has conceded that Mr. Schnoor is shielded from civil liability in this matter.

## I. Findings of Fact

For many years, Glenn Morris and R. Judd Schnoor were principals in MSG, an insurance agency that was formed in 1980 by Glenn Morris's father, James Morris, and then sold to R. Judd Schnoor and Glenn Morris in the 1990s. Glenn Morris and R. Judd Schnoor worked harmoniously selling commercial and personal insurance. In addition, they formed other businesses that engaged in matters relating to their core insurance business. As each man developed businesses on the side, disagreements arose between the two. The disputes came to a head after Promenade of Rockford, LLC, was formed in 2005 and began developing riverside property in the City of Rockford. Judd Schnoor was deeply involved in the construction of a building along the river through his role as a principal in Accurate Construction. As costs for the construction project mounted, Judd Schnoor used lines of credit available to various entities that he controlled with Glenn Morris. In December 2006, Glenn Morris held a meeting with Judd Schnoor and David Charron – the attorney for various entities controlled by Glenn Morris and Judd Schnoor – to address concerns about the flow of money and credit among their business ventures. That meeting did not yield a resolution. Instead, distrust between Glenn Morris and Judd Schnoor escalated after that meeting.

On April 27, 2007, Attorney Charron sent Glenn Morris a memorandum of understanding that was designed to resolve the various financial issues between Glenn Morris and Judd Schnoor. See Plaintiffs' Exhibit 71. Glenn Morris responded with a competing proposal for the division of the two men's financial interests, which prompted Judd Schnoor to inform Glenn Morris of an intent to buy out Glenn Morris's interest for $2.5 million. In July 2007, Glenn Morris filed the instant case seeking dissolution of MSG. Eventually, the Court entered an order directing Glenn Morris to sell his stock in MSG to Judd Schnoor for $2.5 million. A closing statement dated October 26, 2007,

reflects the terms of the court-ordered sale: Judd Schnoor made a down payment of $235,804.00 to Glenn Morris and signed a promissory note in the amount of $2,264,196.00. See Plaintiffs' Exhibit 130. The promissory note required Judd Schnoor to make monthly payments to Glenn Morris in the amount of $45,091.74, commencing on December 25, 2007. See Plaintiffs' Exhibit 124. Under the terms of the court-ordered stock sale, Glenn Morris retained a secured interest in the stock of MSG, but not in its assets. See Plaintiffs' Exhibit 124. In addition, the stock sale did not include a term preventing Glenn Morris from competing in the insurance industry with Judd Schnoor and MSG.

Although Judd Schnoor belatedly made a few monthly payments to Glenn Morris under the the promissory note, see Plaintiffs' Exhibit 189, Judd Schnoor became disgruntled about the loss of clients to Glenn Morris and his competing agency, so Judd Schnoor ceased making payments under the promissory note in the spring of 2008. Judd Schnoor failed to persuade the Court to excuse him from making payments pursuant to the promissory note, and on August 20, 2008, the Court began a hearing to determine whether Judd Schnoor should be held in contempt of court for failing to abide by a court order requiring him to make payments under the promissory note. See 8/20/08 Hearing Tr at 26 (transcript introduced as Exhibit A). At the end of the hearing on August 20, 2008, counsel for Glenn Morris made a request: "I want an order that precludes [Judd Schnoor] from engaging in any out of the ordinary business activity, and no transfers of business interests, or activity, or assets in the meantime." See 8/20/08 Hearing Tr at 106. The Court then asked Attorney Charron, who was counsel for Judd Schnoor: "Any objection to maintaining the status quo for a week or two?" Id. In response, Attorney Charron stated: "Not for a week or two, your Honor." Id. So the Court promised that "it will essentially be an order preventing dissipation of assets or transfer of assets outside the ordinary course of business." Id. at 107.

3

To memorialize the promise made on the record on August 20, 2008, the Court entered an order on August 22, 2008, stating: "IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall not transfer assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court to do so." That written order is at the heart of the dispute in this contempt proceeding. On September 2, 2008, which was the second day of the contempt hearing concerning Judd Schnoor's failure to make payments under the promissory note, counsel for Glenn Morris requested a continuation of the order prohibiting transfers of MSG assets outside the ordinary course of business. See 9/2/08 Hearing Tr at 138 (transcript introduced as Exhibit B). In response, the Court stated: "I'll certainly grant you the relief that you want in that regard. I thought I drafted the order to continue until further order of the Court." Id. at 138-139. Nobody – including Attorney Charron – voiced any objection to that statement, and the Court's written order of August 22, 2008, therefore remained in effect.[2]

While the Court wrestled with the matter of contempt as to Judd Schnoor,[3] Attorney Charron and Judd Schnoor embarked upon an effort to transfer the assets of MSG to a friendly buyer. The first hints of this endeavor are evident in an e-mail from Attorney Charron to Judd Schnoor in which Attorney Charron referred to a payment of $14,000 from Judd Schnoor as a "down payment on an

_____

[2] The record of the 2008 contempt hearing as to Judd Schnoor reveals that the parties were well aware that the written order of August 22, 2008, remained in effect. At the outset of the hearing on September 17, 2008, the Court noted that Glenn Morris had filed a brief opposing a request from Judd Schnoor to lift the stay entered on August 22, 2008. See 9/17/08 Hearing Tr at 4. At the end of that hearing, counsel for Glenn Morris implored the Court to "continue to maintain the stay order" of August 22, 2008. Id. at 104-105. Thus, the discussions between the Court and counsel for the parties during the contempt hearing left no doubt that the order prohibiting extraordinary transfers remained in effect until the Court resolved the request to hold Judd Schnoor in contempt of court.

[3] That issue was resolved on January 15, 2009, in a six-page Order Denying Plaintiff Glenn Morris's Motion to Hold Defendant R. Judd Schnoor in Civil Contempt.

4

asset sale if needed." See Plaintiffs' Exhibit 303. That e-mail presaged the transaction in a succinct proposal that Judd Schnoor could "conduct a UCC sale of your lien against all of the assets of MSG to the new company." Id. That e-mail, which Attorney Charron wrote and sent on August 28, 2008, in the midst of the contempt hearing as to Judd Schnoor, served as a rough blueprint for the deal by which the assets of MSG ultimately changed hands.

By September 2008, while the contempt hearing was in progress, the asset-transfer process began in earnest. In a September 10, 2008, e-mail, Attorney Charron explained that Judd Schnoor "is a secured creditor who holds a security interest against all of the assets of Morris, Schnoor & Gremel, Inc.," and "wants to sell the collateral to satisfy the company's debt to him." See Plaintiffs' Exhibit 310. To satisfy the security interests in MSG held by C&H and Fifth Third Bank, Attorney Charron suggested that "[w]e'll do separate deals with whomever he sells to." Id. As the plan to sell the assets of MSG evolved, the chosen friendly buyer changed from Grand Haven Insurance Agency, Inc., controlled by Dave Young,[4] see Plaintiffs' Exhibit 321, to another entity, see Plaintiffs' Exhibits 337 & 339, which turned out to be NYPIA. See Plaintiffs' Exhibit 397. But the contours of the deal remained the same, i.e., MSG's assets would be sold to a friendly buyer – notwithstanding the court order prohibiting such activity – and the MSG stock in which Glenn Morris held a secured interest would be rendered completely worthless.[5] C&H and Fifth Third Bank would be paid off as secured

---

[4] Dave Young initially was a close confidante of Judd Schnoor, but he ultimately changed sides in the dispute between Glenn Morris and Judd Schnoor. When he did so, he furnished Glenn Morris with a treasure trove of e-mails that laid out the plans hatched by Attorney Charron and Judd Schnoor. Suffice it to say that most of the smoking guns presented by Glenn Morris came to light because of Dave Young, who testified as a witness for Glenn Morris.

[5] On May 7, 2008, Attorney Charron wrote to counsel for Glenn Morris to remind him "that your client does not hold any security interest with [MSG], as alleged by your letter. Mr. Morris' security is and has always been limited to the agency stock . . . ." See Plaintiffs' Exhibit 245.

5

creditors, see Plaintiffs' Exhibit 398, leaving only Glenn Morris high and dry. The asset purchase agreement of November 7, 2008, between C&H and NYPIA laid out this transaction, see Plaintiffs' Exhibit 397, and the bill of sale dated November 21, 2008, memorialized the transaction in which C&H sold all of the assets of MSG to NYPIA for $395,000.[6] See Plaintiffs' Exhibit 415.

The manner in which the assets of MSG changed hands turned out to be a bit more complex than originally anticipated. Although the initial design involved a transfer of the assets of MSG by Judd Schnoor, see Plaintiffs' Exhibit 310, C&H ultimately served as the middleman in its capacity as a secured creditor of MSG. See Plaintiffs' Exhibits 397 & 398. Acting upon a security agreement from May 22, 2008, that granted C&H a secured interest in the assets of MSG, see Plaintiffs' Exhibit 250, C&H took possession of the assets of MSG, see Plaintiffs' Exhibit 398, and then sold all of the assets of MSG to NYPIA, see Plaintiffs' Exhibit 397, which had come into existence shortly before it purchased the assets of MSG. See Plaintiffs' Exhibit 394. When the asset purchase took place in November of 2008, the Court had not lifted the order of August 22, 2008, enjoining all transfers of MSG assets "outside the ordinary course of business."

The Court finds, as a fact, that Attorney Charron and Judd Schnoor were acutely aware that the sale of MSG's assets violated the court order of August 22, 2008.[7] For example, on October 14, 2008, Attorney Charron wrote an e-mail to Dave Young that contained a detailed explanation of the difficulties caused by the existing court order. See Plaintiffs' Exhibit 355. In that e-mail, Attorney

---

[6] NYPIA apparently paid C&H approximately $100,000 in cash, see Plaintiffs' Exhibit 418, and gave a promissory note to C&H in the amount of $295,200. See Plaintiffs' Exhibit 416.

[7] Judd Schnoor filed for bankruptcy protection on January 28, 2009, see Plaintiffs' Exhibit 447, and obtained a discharge on May 17, 2010, see Defendants' Exhibit 192, so Plaintiff Morris has conceded that Schnoor is not subject to civil contempt. Thus, Schnoor's knowledge is significant only insofar as it bears upon the knowledge that can be imputed to MSG and perhaps NYPIA.

6

Charron spelled out the options for transferring any assets of MSG as follows:

> Judd is presently restrained from disposing of company assets except in the ordinary course. Neither his nor the company's creditors are restrained. I may need to file a motion with [Judge] Yates to have him approve the transfer. If I do that, the Court may look for consideration being paid to Morris, Schnoor and Gremel. If we show consideration, Glenn [Morris] will want it and the judge will likely order it to be paid to Glenn. In conclusion, we may need to offer some nominal consideration for the contract transfer, and have me file a motion to get it approve[d]. Alternatively, we don't do this and argue that this was done in the ordinary course.

See Plaintiffs' Exhibit 355. Similarly, when counsel for Glenn Morris raised concerns in December of 2008 about the transfer of MSG assets, Attorney Charron sent a reassuring e-mail stating:

> You already have a stay order which prohibits Judd Schnoor from doing the acts alleged by your email. If you believe he has violated the order, let's have a shoot out so we may disclaim you of the notion.

See Plaintiffs' Exhibit 439. Of course, by that time, all of the assets of MSG had already been sold by C&H to NYPIA, so at the very least that e-mail left a false impression that nothing had happened to diminish the value of the MSG stock in which Glenn Morris held a secured interest. And in this respect, the e-mail speaks volumes about Attorney Charron's view of the propriety of his firm's sale of the assets of MSG to NYPIA.

For his part, Judd Schnoor acknowledged when he testified on August 11, 2011, that he knew he was prohibited by the court order from transferring assets of MSG outside the ordinary course of business. Mr. Schnoor's admission is unsurprising in light of the fact that he was present when the Court indicated on the record on August 20, 2008, that no transfers should occur beyond the ordinary course of business. See 8/28/08 Hearing Tr at 106-107. In addition, Mr. Schnoor conceded during his testimony on August 11, 2011, that he had heard about the Court's written order of August 22, 2008, from Attorney Charron. Consequently, the Court has no doubt whatsoever that Mr. Schnoor

and Attorney Charron were well aware of the court order prohibiting transfers of the assets of MSG outside the ordinary course of business. Beyond that, the Court finds as a fact that they understood that the sale of MSG's assets by C&H to NYPIA in November 2008 violated that court order.

In contrast, the Court finds as a fact that neither Guy Hiestand nor any other NYPIA principal knew of the court order that prohibited the transfer of MSG assets outside the ordinary course of the agency's business. Judd Schnoor testified on August 11, 2011, that he never showed the court order to Mr. Hiestand or told Mr. Hiestand about the order. On October 4, 2011, Mr. Hiestand testified that, although he attended large portions of the contempt hearing concerning Judd Schnoor in August and September 2008, he was not present on August 20, 2008, when the Court prohibited the transfer of MSG assets because he left the hearing early to take his daughter to Michigan State University. To be sure, the Court harbors suspicions that Mr. Hiestand knew of the order, but nothing contained in the e-mail traffic during the relevant time period substantiates the Court's suspicions. Therefore, the Court is left to conclude, as a matter of fact, that Mr. Hiestand did not know of the court order that enjoined the transfer of MSG assets outside the ordinary course of business.

## II.  Conclusions of Law

The Court recognizes that some subjects of the show-cause order are not parties to the above-captioned case, but Michigan law clearly states that "circuit courts . . . have power to punish by fine or imprisonment, or both, persons guilty of any neglect or violation of duty or misconduct in all of the following cases: (g) Parties to actions, attorneys, counselors, and all other persons for disobeying any lawful order, decree, or process of the court." MCL 600.1701(g). See also In re Contempt of United Stationers Supply Co, 239 Mich App 496, 499-501 (2000). Consequently, the Court plainly

8

has the legal authority to hold parties, attorneys, and non-parties alike in civil contempt of court. But the "power to punish for contempt is awesome and carries with it the equally great responsibility to apply it judiciously and only when contempt is clearly and unequivocally shown." People v Matish, 384 Mich 568, 572 (1971). Thus, the Court must act cautiously in exercising its contempt power.

The requisite caution, however, does not obligate the Court to turn a blind eye towards any behavior that plainly constitutes contempt of court. Beyond that, the Court need not excuse any such contemptuous behavior merely because of some purported infirmity in the order of August 22, 2008, enjoining extraordinary transfers of MSG assets. An "order entered by a court of proper jurisdiction must be obeyed even if it is clearly incorrect." See City of Ann Arbor v Danish News Co, 139 Mich App 218, 229 (1984); see also Kirby v Mich High School Athletic Ass'n, 459 Mich 23, 40 (1998); Davis v Detroit Fin Review Team, 296 Mich App 568, 623-626 (2012). Thus, any challenges to the validity of the order of August 22, 2008, are unavailing, especially in light of the fact that the internal e-mail communications of Attorney Charron establish that Judd Schnoor and Attorney Charron both recognized and understood the injunctive force of the order. See Plaintiffs' Exhibits 355 & 439.

Michigan law provides for three separate types of contempt proceedings, and our Supreme Court has explained these three options in clear terms:

> [T]here are three sanctions which may be available to a court to remedy or redress contemptuous behavior: (1) criminal punishment to vindicate the court's authority; (2) coercion, to force compliance with the order; and (3) compensatory relief to the complainant.

In re Contempt of Dougherty, 429 Mich 81, 98 (1987); accord Contempt of United Stationers, 239 Mich App at 499. In this case, the Court has chosen to proceed under the one approach that does not involve any potential for incarceration. This approach lowers the stakes for the alleged contemnors,

9

subjecting them only to potential civil liability "as compensation for actual loss or injury caused by a contemnor's misconduct." Contempt of United Stationers, 239 Mich App at 500; see also MCL 600.1721. That is, when "compensation is intended, a fine is imposed, payable to the complainant." See Contempt of Dougherty, 429 Mich at 98, quoting United States v United Mine Workers, 330 US 258, 303-304 (1947). "'Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.'" Contempt of Dougherty, 429 Mich at 98. In sum, this contempt proceeding is in the nature of a civil action against the alleged contemnors for compensation for the loss flowing from the alleged violation of the Court's order of August 22, 2008.

Having laid the factual foundation and set forth the governing legal principles, the Court must apply the law to the facts in order to determine who must be held responsible for civil contempt and what measure of damages should be awarded to compensate Glenn Morris for the loss resulting from the contemptuous behavior. Unfortunately, Michigan law has not settled upon the standard of proof for civil contempt. Compare In re Contempt of Robertson, 209 Mich App 433, 439 (1995) ("proof of contempt must be clear and unequivocal") with Porter v Porter, 285 Mich App 450, 457 (2009) ("the party seeking enforcement of the court's order bears the burden of proving by a preponderance of the evidence that the order was violated"). In an abundance of caution, the Court will employ the more stringent standard in deciding whether each alleged contemnor should be held in civil contempt of court. Therefore, "proof of contempt must be clear and unequivocal" to support a finding of civil contempt. Contempt of Robertson, 209 Mich App at 439. "But a finding of wilful disobedience of a court order is *not* necessary for a finding of civil contempt." Davis, 296 Mich App at 625. Rather, the Court need only "find that the [alleged contemnor] was neglectful or violated its duty to obey an

order of the court." Contempt of United Stationers, 239 Mich App at 501. Applying these standards, the Court must consider the conduct of each of the alleged contemnors to decide whether any of them should be held in contempt of the court order entered on August 22, 2008.

### A. Morris, Schnoor & Gremel, Inc.

As a result of the court-ordered stock sale completed on October 26, 2007, Judd Schnoor was the one and only principal of MSG when the Court entered its injunctive order on August 22, 2008, prohibiting the transfer of MSG assets "outside the ordinary course of business without authorization from the Court." Consequently, Judd Schnoor's knowledge of the court order should be imputed to MSG. See Attorney General v Richmond Sanitary Landfill, Inc, No 231608, slip op at 2-3 (Mich App Sept 13, 2002) (unpublished decision), citing The Upjohn Co v New Hampshire Ins Co, 438 Mich 197, 214 (1991). Moreover, Judd Schnoor was in the courtroom when the Court explained its injunctive ruling on August 20, 2008, see 8/20/08 Hearing Tr at 106-107, and he acknowledged in his testimony on August 11, 2011, that he knew he was prohibited by court order from transferring assets of MSG outside the ordinary course of business. Thus, MSG can readily be charged with the knowledge that the transfer of MSG assets in November 2008 violated the court order of August 22, 2008.

MSG has suggested that it should be absolved of responsibility because it simply had all of its assets seized by a secured creditor, i.e., C&H. The Court flatly rejects this argument. To be sure, a debtor that has its assets seized by a secured creditor in a true arm's length transaction may be able to plead lack of culpability because its role in the asset transfer was wholly passive. But here, where the record is replete with evidence of Judd Schnoor's involvement in the concerted effort to find a

11

friendly buyer for the assets of MSG, see, e.g., Plaintiffs' Exhibits 303, 337 & 390, the Court cannot

countenance a claim that MSG was merely a victim of its secured creditor's predation. Instead, the

proof of Judd Schnoor's contempt of the court order of August 22, 2009, is "clear and unequivocal,"

see Contempt of Robertson, 209 Mich App at 439, so the Court necessarily concludes that MSG –

through its principal, Judd Schnoor – acted in contempt of the court order.

    Having arrived at a finding of contempt as to MSG, the Court must determine the appropriate

remedy for that contempt. "A court may issue an order to pay compensation for the actual loss or

injury caused by the contemnor's misconduct." Contempt of United Stationers, 239 Mich App at

500. That remedy is appropriate with respect to MSG, largely because the asset sale stripped Glenn

Morris of the value in his secured interest in 50 percent of the stock of MSG.[8] See Plaintiffs' Exhibit

125. Therefore, in order to compensate for the loss caused to Glenn Morris, MSG must pay Glenn

Morris one-half of the value of MSG's assets that were seized by C&H and then transferred through

the asset purchase by NYPIA in November of 2008.[9] The Court, therefore, must determine the value

of MSG's assets and then divide that number in half to set the appropriate measure of damages.

---

    [8] Prior to the court-ordered sale of MSG stock on October 26, 2007, Judd Schnoor and Glenn Morris each owned 50 percent of the shares. See Plaintiffs' Exhibit 125. As a result of the court-ordered sale, Judd Schnoor owned all of the stock in MSG, see Plaintiffs' Exhibit 130, and Glenn Morris retained a secured interest in the 50 percent of the shares that he transferred to Judd Schnoor. See Plaintiffs' Exhibit 125. The purpose of this arrangement was to secure Glenn Morris's right to collect on a promissory note from Judd Schnoor in the amount of $2,264,196. See Plaintiffs' Exhibit 124.

    [9] Even if Judd Schnoor had maintained MSG as a going concern and surrendered half of his interest in MSG to Glenn Morris as a remedy for Judd Schnoor's default on his obligation under the promissory note to Glenn Morris, Judd Schnoor would have retained the 50-percent interest in MSG that he held prior to the court-ordered sale on October 26, 2007. Accordingly, Glenn Morris is only entitled to be compensated for half of the value of the assets of MSG. The other half of the value was held (and ultimately lost) by Judd Schnoor when C&H seized the assets of MSG and sold those assets to NYPIA.

The question of valuation provides the Court with a mélange of options. Both sides adduced expert testimony regarding the value of MSG. Plaintiff Morris's expert witness, Wayne Walkotten,[10] set the value of MSG's assets at $3.3 million. See Plaintiffs' Exhibits 497, 499. The defendants' expert witness, Thomas Vereecke, found that "the fair market value of [NYPIA] as of November 20, 2008," was $540,000 under the capitalization-of-earnings method. See Defendants' Exhibit 238-C. The Court finds both experts' analyses riddled with flawed assumptions.[11] The defects are borne out by comparisons to contemporaneous indicia of the actual value of MSG and application of the most common measures of value in the industry. Both Mr. Vereecke and William Woodworth, NYPIA's principal, believed that MSG enjoyed an annual revenue stream of approximately $2 million. See Woodworth Deposition (Jan 20, 2010) at 78. That revenue flowed from two sources – commission income that arrived over the course of the year and a round of contingent income that usually arrived in February each year. The revenue estimates of Mr. Vereecke and Mr. Woodworth roughly coincide with income reports on the tax returns of MSG and NYPIA for 2008, which add up to approximately $2.434 million. See Plaintiffs' Exhibits 512 ($2,322,893 in MSG income over 11-month period), 514 ($111,054 in gross receipts or sales for NYPIA over one-month period).

---

[10] During and after trial, the parties engaged in a pitched battle concerning the qualifications of Mr. Walkotten to furnish a calculation of value. The Court regards that dispute as nothing more than a tempest in a teapot for two reasons. First and foremost, the Court has chosen not to adopt the analysis of Mr. Walkotten in setting the value of MSG's assets. Second, according to MRE 702, an expert witness may be qualified to offer opinion testimony based upon "knowledge, skill, experience, training, or education." Regardless of the status of Mr. Walkotten's professional license as a CPA, he most assuredly possessed the knowledge, skill, experience, training, *and* education necessary to provide opinions about the value of MSG's assets.

[11] During trial, much was made of the vicissitudes in broader markets and the contraction of capital markets during the time period when MSG's assets were seized and sold. To be sure, these developments yielded downward pressure upon market prices that cannot be gainsaid, but MSG had a stable flow of revenue in an industry that was relatively recession-proof.

Revenue figures in excess of $2 million for MSG may slightly overstate the value of MSG by the time its assets were seized and sold by C&H. A steady migration of clients from MSG to the new insurance agency run by Plaintiff Glenn Morris cut into MSG's revenue stream. Indeed, the tax return for NYPIA for 2009 reports total income of $1,744,104, see Plaintiffs' Exhibit 515, which is indicative of the ongoing challenges resulting from the loss of MSG's former clients. Accordingly, the Court finds as a fact that a reasonable forecast for MSG's annual revenue as of November 2008 would have predicted approximately $1.8 million per year. Having established the appropriate level of revenue for MSG at the time its assets were seized by C&H and sold to NYPIA in contravention of the court order entered on August 22, 2008, the Court next must consider how this annual revenue stream relates to the value of MSG's assets.

The witnesses with knowledge of the insurance industry universally agreed that the value of an insurance agency can be roughly established by multiplying the agency's revenue by a figure in the neighborhood of 1.50. James Morris testified at trial that a multiplier of 1.5 should be applied to an agency's book of business to determine its value. Wayne Walkotten presented industry data to support the conclusion that the multiplier should be 1.52. See Plaintiffs' Exhibit 30. The Court concludes that this figure accurately reflects the premium in the industry for the purchase and sale of agencies such as MSG. Consequently, the Court finds as a fact that MSG was worth $2,736,000, i.e., $1.8 million times 1.52, when its assets were seized by C&H and sold to NYPIA. Dividing that number in half to arrive at Plaintiff Glenn Morris's loss based upon his secured interest in 50 percent of MSG's stock, the Court concludes that MSG should be sanctioned in the amount of $1,368,000 to compensate Glenn Morris for the harm resulting from the seizure and sale of the assets of MSG in violation of the court order entered on August 22, 2008.

14

B. Attorney David Charron

The most vexing aspect of the Court's civil contempt analysis concerns Attorney Charron, who wore two hats in the underlying proceedings. First, he acted as counsel for MSG. Second, he acted as a principal for his own firm, Charron & Hanisch. His actions in the latter role clearly must be imputed to the law firm itself, and the Court will address the contempt sanction against the law firm *infra*. His actions in the former role require the Court to determine his personal responsibility for civil contempt of court. Michigan law plainly establishes that attorneys can be held in contempt of court both for their actions on behalf of their clients, e.g., Schumacher v Tidswell, 138 Mich App 708, 715-716, 722 (1984), and for their interactions with their clients. E.g., Schoensee v Bennett, 228 Mich App 305, 317 (1998). Moreover, MCR 3.310(C)(4) makes clear that an injunctive order – such as the Court's order of August 22, 2008, prohibiting transfers of MSG's assets "outside the ordinary course of business" – binds parties and their attorneys alike. Finally, the transcript of the 2008 contempt hearing reveals that Attorney Charron directly and actively participated in discussing the terms of the injunctive order, see 8/20/08 Hearing Tr at 106-107, so Attorney Charron cannot disclaim knowledge of the order. In fact, his internal e-mail traffic confirms that he was well aware of the continuing force of the Court's injunctive decree. See, e.g., Plaintiffs' Exhibit 355.

The Court must initially confront Attorney Charron's culpability for contempt of court. In simple terms, the record reveals a textbook example of contempt of court by Attorney Charron, who recognized that a court order prohibited all transfers of MSG's assets outside the ordinary course of business, see, e.g., Plaintiffs' Exhibit 355, yet took actions on behalf of his client (MSG) and his own law firm that did precisely what the court order forbade. That is, Attorney Charron siphoned all of the assets of MSG through his law firm and passed them on to NYPIA. See Plaintiffs' Exhibits 397,

15

398. These forbidden acts, when coupled with Attorney Charron's recognition of the impropriety of his conduct, e.g., Plaintiffs' Exhibits 355, 439, compel the Court to find, by clear and convincing evidence, that Attorney Charron acted in contempt of the court order entered on August 22, 2008.

The Court must next turn to the appropriate sanction for Attorney Charron's contempt. Our Court of Appeals has identified compensation as a proper sanction for contempt, see In re Contempt of Auto Club Ins Ass'n, 243 Mich App 697, 708 (2000); see also MCL 600.1721, but has upheld at least one ruling that attorneys and their clients need not be assigned that sanction in equal measure. See Schoensee, 228 Mich App at 311. The sanction of compensation for Plaintiff Glenn Morris must be imposed in a manner that reflects economic reality. Here, Plaintiff Glenn Morris logically should receive compensation for loss of value to MSG from the entities that dispossessed him of that value, i.e., MSG and C&H.[12] The appropriate sanction for Attorney Charron, in contrast, involves "a civil contempt sanction in the form of a compensatory award of attorney fees, other costs, or both," that Plaintiff Glenn Morris incurred in pursuing civil contempt against Attorney Charron. See Davis, 296 Mich App at 626. Therefore, the Court shall direct Attorney Charron to compensate Plaintiff Glenn Morris for the attorney fees and costs he incurred in the contempt trial that took place in 2011. This sanction cannot yet be assessed, in part because the Court lacks all of the information necessary to compute that remedy and in part because Attorney Charron is entitled to an evidentiary hearing at which he may challenge the fees and costs claimed by Plaintiff Glenn Morris. See B&B Investment Group v Gitler, 229 Mich App 1, 15-17 (1998). Accordingly, the Court will set a hearing in which Plaintiff Glenn Morris may present evidence in support of a claim for attorney fees and costs.

---

[12] In addition, the Court has provided substantial relief to Glenn Morris and an entity known as Morris, Schnoor & Gremel Properties, LLC, through a clawback remedy against NYPIA in two separate actions under the Uniform Fraudulent Transfer Act.

16

### C.   Charron & Hanisch, P.L.C.

At all relevant times, Attorney Charron was a principal of his law firm, Defendant C&H, so his knowledge of the injunctive order entered on August 22, 2008, must be imputed to C&H.  See Richmond Sanitary Landfill, No 231608, slip op at 2-3 (Mich App Sept 13, 2002), citing The Upjohn Co, 438 Mich at 214.  Beyond that, the transcript of the 2008 contempt hearing as to Judd Schnoor demonstrates that Attorney Charron actively participated in discussing the terms of the injunctive order, see 8/20/08 Hearing Tr at 106-107, so C&H – through Attorney Charron – fully understood the requirements of the Court's injunctive order of August 22, 2008.  Finally, Attorney Charron's internal e-mails establish that he knowingly took part in activities that violated the injunctive order, see, e.g., Plaintiffs' Exhibits 355, 439, and his actions in seizing all of the assets of MSG and then transferring those assets to NYPIA plainly contravened the injunction.[13]  See Plaintiffs' Exhibits 397, 398.  Thus, based upon the actions of Attorney Charron, the Court must find, by clear and convincing evidence, that Defendant C&H acted in contempt of the court order entered on August 22, 2008.

As the Court noted in assessing contempt sanctions against MSG, a "court may issue an order to pay compensation for the actual loss or injury caused by the contemnor's misconduct."  Contempt of United Stationers, 239 Mich App at 500.  That remedy is appropriate with respect to C&H, largely because C&H's seizure and disposal of all the assets of MSG stripped Plaintiff Glenn Morris of the value in his secured interest in 50 percent of the stock of MSG.  Therefore, in order to compensate

---

[13] The Court's determination flows naturally from the collusive relationship between Judd Schnoor and Attorney Charron.  If C&H had simply exercised its rights as a secured creditor in order to obtain overdue attorney fees from MSG, the Court might well believe that neither MSG – as the restrained party – nor C&H acted in derogation of the injunctive order.  But the concerted effort to siphon all of MSG's assets through C&H to a friendly buyer, and thereby strip Plaintiff Morris of all recourse despite his secured interest in the stock of MSG, leads ineluctably to the conclusion that MSG and C&H worked together in a manner that blatantly violated the injunctive order.

17

for the loss caused to Glenn Morris, C&H must pay Glenn Morris one-half of the value of MSG's

assets that were seized by C&H and then transferred through the asset purchase by NYPIA that took

place on November of 2008.[14] As the Court explained in detail in its discussion of Defendant MSG's

liability, this amount turns out to be $1,368,000. Accordingly, Defendant C&H must be sanctioned

in that amount as a matter of civil contempt to compensate Plaintiff Glenn Morris.

Superficially, this heavy sanction might be regarded as a ruinous pecuniary mulct against a

law firm that merely acted as a secured creditor to collect attorney fees to which it was entitled, but

the Court's analysis reveals a much different picture. First, the amount of the sanction is designed

to be compensatory, rather than punitive. Indeed, civil contempt demands such an approach. See,

e.g., Contempt of United Stationers, 239 Mich App at 500. The size of the sanction simply reflects

the amount of harm done to Plaintiff Glenn Morris by the contemptuous conduct. Second, the nature

of the sanction merely reflects the ill-advised decision by Defendant C&H to put itself in the middle

of its client's dispute with Plaintiff Glenn Morris by serving as an essential player in the transaction

aimed at delivering all of the assets of its client, i.e., MSG, to a friendly buyer. Third, by taking a

secured interest in all of the assets (as opposed to a discrete asset) of its client in order to secure the

payment of attorney fees, Defendant C&H assumed a role much greater than a mere creditor in any

---

[14] The liability of Defendant C&H in this regard must be joint and several with the liability
of MSG. As a general rule, actors "join together to evade a judgment, they become jointly and
severally liable for the amount of damages resulting from the contumacious conduct." Nat'l Labor
Relations Bd v Laborers' Int'l Union of North America, AFL-CIO, 882 F2d 949, 955 (5th Cir 1989).
Although the Court has encountered a paucity of Michigan precedent on this subject, our Court of
Appeals has upheld—albeit without objection—the assessment of joint and several liability for civil
contempt sanctions on at least one occasion. See Erickson v Meijer, Inc, No 215760, slip op at 7 n1
(Mich App May 12, 2000) (unpublished decision). The Court recognizes that, because Defendant
MSG now exists as a mere empty shell, the obligation for compensatory sanctions will fall squarely
on Defendant C&H. Nevertheless, the obligation must be stated as joint and several with MSG.

effort to collect its attorney fees. To be sure, the Court recognizes that law firms often take on the role of a secured creditor in order to ensure the payment of legitimate attorney fees, but nothing in the arrangement between MSG and C&H fits that ordinary pattern. Instead, by assuming the role of middleman as to all of the assets of MSG, Defendant C&H subjected itself to liability in the form of compensatory sanctions when acted in contravention of the court order of August 22, 2008. Its liability for $1,368,000 in compensatory sanctions merely reflects that basic fact.

### D. New York Private Insurance Agency, LLC

Without question, NYPIA received the lion's share of the benefit when it purchased all of the assets of MSG from C&H in November of 2008.[15] Nevertheless, the Court cannot find NYPIA in civil contempt unless the record establishes, by clear and convincing evidence, that NYPIA had notice of the injunctive order entered on August 22, 2008, that prohibited transfers by MSG outside the ordinary course of business. See Brooks v January, 116 Mich App 15, 32-33 (1982). Notice of an order can be established either by service of the order, see, e.g., Contempt of United Stationers, 239 Mich App at 503, or by proof or inference of actual knowledge of the order. See, e.g., Cross Co v UAW Local No 155, 377 Mich 202, 216-217 (1966). Here, despite his best effort, Plaintiff Glenn Morris has not established that NYPIA had notice of the Court's injunctive order. Accordingly, the Court cannot hold NYPIA in contempt of that order entered on August 22, 2008. See Brooks, 116 Mich App at 32-33.

---

[15] MSG was rendered impecunious and C&H simply obtained an amount roughly equal to its outstanding attorney fees as a result of the two-step transaction. Only NYPIA greatly benefitted from the transaction by obtaining more than $2 million in assets for a small fraction of that amount. This benefit, however, is subject to a clawback remedy in two related civil actions under the Uniform Fraudulent Transfer Act.

The principals of NYPIA – William Woodworth and Guy Hiestand – disclaimed knowledge of the court order. Plaintiff Glenn Morris does not contest this assertion made by Mr. Woodworth, but Plaintiff Morris contends that Mr. Hiestand knew of the order and, beyond that, Judd Schnoor's knowledge should be imputed to NYPIA. With regard to Mr. Hiestand, the Court finds as a fact that he attended the contempt hearing for Judd Schnoor, but the Court cannot find that Mr. Hiestand was present when the parties discussed – and the Court imposed – the injunctive order at the heart of this contempt matter. Mr. Hiestand testified at the contempt trial that he left early on the day in question to take his daughter to Michigan State University. Although several witnesses offered recollections concerning Mr. Hiestand's presence, that testimony is much too vague to support a finding, by clear and convincing evidence, that Mr. Hiestand was in the courtroom when the Court orally prohibited all transfers of MSG assets outside the ordinary course of business. The Court's finding is buttressed by the fact that Mr. Hiestand did not participate in e-mail discussions of the Court's injunctive order. With respect to Mr. Schnoor, the Court finds his limited role with NYPIA insufficient to support a ruling that his knowledge of the injunctive order must be imputed to NYPIA. Judd Schnoor was not employed by NYPIA when the contemptuous acts occurred; he signed on with NYPIA after NYPIA had bought the assets of MSG. Although "knowledge possessed by a corporation about a thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing, acquire while they are acting under and within the scope of their authority[,]" see Richmond Sanitary Landfill, No 231608, slip op at 2 (Mich App Sept 13, 2002), citing The Upjohn Co, 438 Mich at 214, Judd Schnoor was neither an officer nor an agent of NYPIA during the time period when the contempt took place. Accordingly, NYPIA cannot be subjected to contempt sanctions in view of its lack of notice of the Court's injunctive order.

20

### III. Summary of Civil Contempt Findings and Sanctions

For all of the reasons set forth above, and pursuant to MCL 600.1721, the Court imposes the following compensatory sanctions as redress for acts of civil contempt: Defendant Morris, Schnoor & Gremel, Inc., and Charron & Hanisch, PLC, are jointly and severally liable for $1,368,000 payable to Plaintiff Glenn Morris as redress for the harm resulting from the seizure and sale of MSG's assets in violation of the court order of August 22, 2008; and Attorney David Charron is responsible for the amount of reasonable attorney fees and costs incurred by Plaintiff Glenn Morris in connection with this contempt proceeding.[16] In light of the Court's conclusion that New York Private Insurance Agency, LLC, had no knowledge of the Court's order of August 22, 2008, the Court can neither find NYPIA in contempt of court nor impose any compensatory sanction upon NYPIA.

IT IS SO ORDERED.

Dated: December 27, 2012

HON. CHRISTOPHER P. YATES (P41017)
Kent County Circuit Court Judge

---

[16] Plaintiff Glenn Morris also may request an award of fees and costs from Defendant MSG and C&H as redress for the harm caused by those entities' acts of contempt. See *In re* Contempt of Henry, 282 Mich App 656, 684-686 (2009) (upholding "civil remedial sanctions of attorney fees and costs" under MCL 600.1721 in criminal contempt action). Like Attorney Charron, Defendant MSG and C&H may demand an evidentiary hearing at which Plaintiff Glenn Morris's claim for attorney fees and costs can be challenged. See B&B Investment Group, 229 Mich App at 15-17.

21

## EXHIBIT B

## THE ATTORNEY FEE OPINION

STATE OF MICHIGAN
IN THE 17th CIRCUIT COURT FOR KENT COUNTY

GLENN S. MORRIS; and THE GLENN
S. MORRIS TRUST,

            Plaintiffs/Counter-Defendants,

                                       Case No. 07-06441-CR
vs.

                                       HON. CHRISTOPHER P. YATES
R. JUDD SCHNOOR; and MADCAP
ENTERPRISES, LLC, substituting for
MORRIS, SCHNOOR & GREMEL, INC.,

            Defendants/Counter-Plaintiffs.

_____/

OPINION AND ORDER AWARDING ATTORNEY FEES TO PLAINTIFF
<u>GLENN S. MORRIS AND AGAINST ATTORNEY DAVID W. CHARRON</u>

      In this civil action involving a now-defunct insurance agency known as Morris, Schnoor &

Gremel, Inc. ("MSG"), the Court issued an opinion and order on December 27, 2012, that contained

the conclusion that "Attorney David Charron is responsible for the amount of reasonable attorney

fees and costs incurred by Plaintiff Glenn Morris in connection with this contempt proceeding." <u>See</u>

Opinion and Order Setting Forth Findings of Civil Contempt at 21 (Dec 27, 2012).  The Court did

not establish the amount of attorney fees and costs that Attorney Charron had to pay.  Instead, the

Court acknowledged that "Attorney Charron is entitled to an evidentiary hearing at which he may

challenge the fees and costs claimed by Plaintiff Glenn Morris." <u>Id.</u> at 16, <u>citing</u> <u>B&B Investment</u>

<u>Group</u> v <u>Gitler</u>, 229 Mich App 1, 15-17 (1998).  Based upon the record developed during the five-

day evidentiary hearing, the Court finds that Plaintiff Morris is entitled to an award of $349,416 in

attorney fees and $14,090.77 in costs from Attorney Charron.  Therefore, the Court shall enter a final

judgment reflecting that award.

<u>I. Factual Background</u>

Throughout the protracted litigation in the above-captioned case, Attorney Charron served as lead counsel for Defendant MSG. Although Attorney Charron performed brilliantly as counsel in innumerable hearings, he also became enmeshed in activities that directly violated a court order prohibiting all transfers of MSG's property outside the ordinary course of business. With a heavy heart, the Court found that Attorney Charron had engaged in actions rising to the level of contempt of court, <u>see</u> Opinion and Order Setting Forth Findings of Civil Contempt at 15-16 (Dec 27, 2012), and ordered a civil remedy by directing Attorney Charron "to compensate Plaintiff Glenn Morris for the attorney fees and costs he incurred in the contempt trial that took place in 2011." <u>See id.</u> at 16. Thus, the Court promised to "set a hearing in which Plaintiff Glenn Morris may present evidence in support of a claim for attorney fees and costs." <u>See id.</u>

For five days, Plaintiff Morris furnished the Court with testimony and other evidence as to the attorney fees resulting from the contempt trial. Attorney Charron participated in that hearing as well, conducting extensive cross-examination of Morris's attorney, Stanley Stek, challenging the admissibility of some of Morris's exhibits, eliciting testimony from Morris himself, and presenting a compelling final argument. Based upon the record developed at that hearing – which took place on April 9, 11, and 17, 2013, May 28, 2013, and July 1, 2013 – the Court must determine the amount of attorney fees and costs to award Morris. In reaching that determination, the Court finds as a fact that Morris's attorneys and their support staff performed all of the work claimed in the exhibits that were admitted at the evidentiary hearing. But the Court's responsibility is to establish "a reasonable attorney fee[,]" <u>see</u> <u>Smith</u> v <u>Khouri</u>, 481 Mich 519, 529 (2008), so the Court must carefully assess the reasonableness of each element of Morris's claim for attorney fees and costs.

2

## II. Attorney Fees

In presenting a claim for attorney fees and costs, Plaintiff Morris recognizes that "the burden of proving the reasonableness of the requested fees rests with the party requesting them." Smith, 481 Mich at 528-529. Our Supreme Court has prescribed a three-step process for setting a reasonable attorney fee.[1] First, the Court "should begin the process of calculating a reasonable attorney fee by determining" the "reasonable hourly or daily rate customarily charged in the locality for similar legal services[.]" Id. at 522. Second, that hourly rate "should be multiplied by the reasonable number of hours expended." Id. Third, "the court may consider making adjustments up or down in light of the other factors listed in Wood v [DAIIE, 413 Mich 573 (1982)] and MRPC 1.5(a)." Id. Accordingly, the Court shall address each of these three issues in turn.

### A. Reasonable Hourly Rates.

On April 8, 2013, the parties entered into a "Stipulation and Order Regarding Hourly Rates." Citing Smith, 481 Mich 519, that document sets hourly rates for the Court to use in establishing the amount of attorney fees due from Attorney Charron to Plaintiff Morris. Specifically, the stipulation memorialized the agreement that Attorney Stanley Stek's time should be computed at $385 per hour, the time for Attorneys Andrew Blum and Joseph Infante should be calculated at $240 per hour, and Legal Assistant Beverly Clover's time should be compensated at $130 per hour. Although Attorney Charron at times during the evidentiary hearing challenged those hourly billing rates, a "stipulation

---

[1] Although the lead opinion in Smith, 481 Mich 519, by Chief Justice Taylor was joined by Justice Young alone, the concurrence of Justice Corrigan (joined by Justice Markman) "concur[red] with the reasoning and result of the lead opinion, with one exception" that has no bearing upon the request by Plaintiff Morris. See Smith, 481 Mich at 538 (Corrigan, J, concurring). Consequently, the Court shall faithfully apply the three-step analysis set forth in Smith.

3

is given full force and effect and is binding upon the parties unless abandoned or disaffirmed." <u>See</u> <u>Blue Cross and Blue Shield of Michigan</u> v <u>Eaton Rapids Community Hospital</u>, 221 Mich App 301, 307 (1997). Accordingly, the Court shall rely upon the hourly rates prescribed by the stipulation of Attorney Charron and Plaintiff Morris.

      B. <u>Reasonable Number of Hours Expended</u>.

      Having established reasonable hourly rates for the attorneys and the legal assistant involved in the case, the Court must determine "the reasonable number of hours expended" and multiply that number of hours by the reasonable hourly rates to obtain "a baseline figure." <u>See</u> <u>Smith</u>, 481 Mich at 522, 533. As contemplated by our Supreme Court, Plaintiff Morris has submitted "detailed billing records, which the court must examine[.]" <u>Id.</u> at 532. In setting the appropriate number of hours for which Morris can obtain compensation for attorney fees, the Court must bear in mind that contempt cases require reimbursement for "attorney fees, whether those fees were related to the prosecution of the contempt, the investigation of the contempt, or to fashioning a remedy for the contempt[.]" <u>See</u> <u>Taylor</u> v <u>Curie</u>, 277 Mich App 85, 102 (2007). However, "'excessive, redundant or otherwise unnecessary hours regardless of the attorneys' skill, reputation or experience' should be excluded." <u>Van Elslander</u> v <u>Thomas Sebold & Associates, Inc</u>, 297 Mich App 204, 231 (2012). Thus, Morris cannot receive compensation for tasks that simply duplicated the work of the lead attorney. <u>See id.</u> at 239. Beyond that, Morris cannot recover attorney fees for time spent on matters "only tenuously connected to the contempt[.]" <u>See</u> <u>Taylor</u>, 277 Mich App at 102. In other words, Attorney Charron need not foot the bill for Morris's overall litigation costs. Applying these principles, the Court must determine the number of hours for which Morris is entitled to compensation.

4

Plaintiff Morris's lead counsel, Attorney Stanley Stek, pulled the laboring oar throughout the litigation of the contempt matter. Not surprisingly, his hours comprise the bulk of the time for which the Court shall provide compensation. In addition, Attorneys Andrew Blum and Joseph Infante put in time primarily outside the courtroom working on the contempt matter. Finally, Legal Assistant Beverly Clover, whose hours may be included in Morris's request by dint of MCR 2.626,[2] invested a substantial amount of time both inside and outside the courtroom. Accordingly, the Court must consider each of those professionals' hours in establishing the amount of time for which Morris can obtain compensation for attorney fees. In discussing the compensable hours, the Court shall follow the lead of Morris's attorneys by dividing the hours into several time periods.

The first billing period runs from January 21, 2009, (the date Plaintiff Morris learned that the assets of MSG had been transferred to New York Private Insurance Agency ("NYPIA") in violation of a court order), through September 18, 2009, (the date on which Morris decided to seek sanctions for contempt). During this initial phase involving "the investigation of the contempt," see Taylor, 277 Mich App at 102, Morris contends that he was billed $66,162.50 in attorney fees for work that related to the contempt matter. See Hearing Tr (April 11, 2013) at 18; see also Hearing Exhibit A. Based upon a detailed analysis of Exhibit A from the evidentiary hearing, the Court finds that 26.3 hours should be compensated for the work of Attorney Stek, 6.2 hours for Attorney Blum, 10 hours for Attorney Infante, and 9.8 hours for Legal Assistant Clover. These hours, which are reflected on Exhibit A by highlighting, do not include time spent on matters such as the attempted settlement of

---

[2] Although the inclusion of a legal assistant's hours as "attorney fees" may seem anomalous, MCR 2.626 states that "[a]n award of attorney fees may include an award for the time and labor of any legal assistant who contributed nonclerical, legal support under the supervision of an attorney, provided the legal assistant meets the criteria set forth in Article 1, § 6 of the Bylaws of the State Bar of Michigan." Legal Assistant Clover manifestly satisfies those criteria.

5

ongoing litigation, hearings concerning checks from insurance companies to NYPIA and an attempt
to disqualify Morris's counsel from ongoing litigation, and development of claims under the Uniform
Fraudulent Transfer Act. See Taylor, 277 Mich App at 102-103. In addition, the Court has excised
duplicate hours where more than one professional billed for participating in a single conference. See
Van Elslander, 297 Mich App at 231, citing Smith, 481 Mich at 532 n17.

   The second billing period runs from September 19, 2009, (the point at which Plaintiff Morris
decided to pursue contempt), through November 16, 2009, (the date on which the petition seeking
contempt was filed). This period, which included both the investigation and the early stages of the
prosecution of the contempt, see Taylor, 277 Mich App at 102, resulted in $35,170.50 in billings to
Morris. See Hearing Tr (April 11, 2013) at 50; see also Hearing Exhibit B. The Court's review of
Exhibit B from the hearing yields the following compensable hours: 20.6 hours for Attorney Stek;
6 hours for Attorney Blum; no time for Attorney Infante; and 30 hours for Legal Assistant Clover.
In arriving at these figures, the Court excluded time spent on discovery and other tasks in ongoing
litigation, which did not bear directly upon the contempt matter. See Taylor, 227 Mich App at 102-
103.

   The third billing period runs from November 17, 2009, (the point at which Plaintiff Morris
formally requested a finding of contempt), until June 27, 2011, (the day before the beginning of the
contempt hearing). By this point, Morris was sharpening his issues and preparing for a hearing, so
that period can readily be characterized as both investigation and prosecution of the contempt. See
Taylor, 277 Mich App at 102. During that phase of the proceedings, Morris's attorneys billed him
$225,504. See Hearing Tr (April 11, 2013) at 56; Hearing Exhibit C. Based upon Exhibit C from
the hearing, the Court finds that the following hours were billed by the professionals for matters that

6

related to the contempt: 132.6 hours for Attorney Stek; 138 hours for Attorney Blum; 97.2 hours for Attorney Infante; and 132.6 hours for Legal Assistant Clover. In calculating these figures, the Court excluded time devoted to the Uniform Fraudulent Transfer Act claims, all bankruptcy proceedings, and all efforts to settle the parties' disputes through facilitative mediation.

The fourth billing period runs from June 28, 2011, (the date on which the contempt hearing began), until February 2, 2012, (more than one month after the contempt hearing ended). The bulk of the time billed to Plaintiff Morris during this period involved "the prosecution of the contempt" for more than 20 days of court hearings. See Taylor, 277 Mich App at 102. In arriving at the total number of hours for each attorney, the Court has excluded double-billed time, i.e., time billed by two attorneys for the same court hearing.[3] See Van Eslander, 297 Mich App at 238-239. Similarly, the Court has excluded trial time billed by Legal Assistant Clover. In doing so, the Court has not acted in a manner that denigrates the contributions of paralegals. Instead, the Court has simply chosen to follow the teachings from our appellate courts on the subject of multiple billing for the same work. See id. at 239, citing Smith, 481 Mich at 532 n17. Applying this approach, the Court finds that the following hours necessitate compensation: 217.1 hours for Attorney Stek; 116.3 hours for Attorney Blum[4]; 40.7 hours for Attorney Infante; and 125.7 hours for Legal Assistant Clover.[5] Although the Court included most of the hours billed during the course of the trial, the Court did not provide any

---

[3] For example, on the first day of trial (June 28, 2011), Attorneys Stek and Blum both billed for approximately two and a half hours in trial. See Hearing Exhibit D. The Court only counted the hours billed by the lead attorney, i.e., Attorney Stek.

[4] The Court excluded two entries on the fourth page of Hearing Exhibit D for Attorney Blum because those entries for 1.1 and 0.8 hours appear to be duplicates of the previous two lines.

[5] On the seventh page of Hearing Exhibit D, there appears a billing line for "0.25 hours" for Legal Assistant Clover. The Court rounded that entry down to 0.2 hours.

7

compensation for time billed by professionals other than the three named attorneys and the named legal assistant, even though other professionals such as "David L. Jarvis" and "Vernon Bennett III" contributed to the billings set forth in Hearing Exhibit D.

The fifth and final billing period runs from February of 2012 through May 29, 2013. Very little billing took place in this post-trial period, as reflected in Hearing Exhibits F and J. Because the majority of the time billed in this period relates to the presentation of the claim for attorney fees, the Court concludes that most of that time was necessary for "fashioning a remedy for the contempt." See Taylor, 277 Mich App at 102. Thus, the Court finds that the following hours must be considered in awarding compensation: 83 hours for Attorney Stek; 94.1 hours for Attorney Blum; 5.9 hours for Attorney Infante; and 19.7 hours for Legal Assistant Clover. Adding these figures to those for the first four time periods, the Court concludes that the total amount of hours and the corresponding fees are as follows: **479.6 hours at $385 per hour equals $184,646 for Attorney Stek; 360.6 hours at $240 per hour equals $86,544 for Attorney Blum; 153.8 hours at $240 per hour equals $36,912 for Attorney Infante; and 317.8 hours at $130 per hour amounts to $41,314 for Legal Assistant Clover.** Adding these four figures together, the Court arrives as **an aggregate attorney-fee award of $349,416.**

C. Consideration of Adjustments.

The final stage of the Court's analysis of reasonable attorney fees requires consideration of factors such as "'(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client.'"

8

*Smith*, 481 Mich at 529, quoting *Wood*, 413 Mich at 588; see also *Smith*, 481 Mich at 530, quoting MRPC 1.5(a) (listing eight factors for consideration).  The process of establishing the contempt in this case was arduous, and Plaintiff Morris's attorneys carried out their tasks with determination and skill.  For that reason, the seemingly exorbitant aggregate attorney fee of $349,416 strikes the Court as eminently reasonable.

Attorney Charron contends that two factors unique to this case necessitate a reduction of the aggregate fee.  First, the lengthy contempt hearing was joined with the bench trial of claims asserted by Plaintiff Morris under the Uniform Fraudulent Transfer Act ("UFTA") against defendants other than Attorney Charron, so much of the trial involved presentation of evidence that bore largely – and sometimes even exclusively – upon the UFTA claims.  But Morris has segregated the attorney fees for those two matters, and the Court has gone to great pains in reviewing the attorney fees requested by Morris to exclude time that even arguably was spent on the UFTA claims.[6]  Therefore, the Court cannot conclude that the aggregate fee computed in this opinion should be reduced to account for time spent on the development and presentation of the UFTA claims.

Attorney Charron also asserts that attorney fees are unwarranted because Plaintiff Morris has paid his attorneys only a small fraction of the fees for which he seeks compensation.  To be sure, the testimony of Morris establishes that he has fallen behind on his financial obligations to his attorneys to the tune of more than half a million dollars.  See Hearing Tr (July 1, 2013) at 79.  But Morris also

---

[6] The Court has attached all of the billing records to this opinion, albeit under seal, to enable the parties and the appellate courts to review the Court's specific rulings with respect of every line billed by the attorneys for Plaintiff Morris.  Each highlighted entry represents a compensated item in the Court's analysis.  A review of the billing records – which were admitted as Hearing Exhibits A, B, C, D, F, and J – reveals that the Court excluded a myriad of billing entries from its award.  The total request submitted by Morris amounted to $554,395 in attorney fees.  The Court's award sliced more than $200,000 from that request.

9

testified that he made substantial payments for attorney fees through 2011. See id. at 81. Beyond

that, Morris acknowledged that he was obligated to pay for all of his attorney fees, irrespective of

the extent of his recovery from his various lawsuits. See id. at 82-83. Under Michigan law, attorney

fees generally cannot be recovered for legal services provided *pro bono*. As our Court of Appeals

has explained:

> It is difficult to justify the award as a sanction of fees for an individual who provided
> services that were agreed to be performed gratis. Such a result constitutes a windfall
> as it was not part of the billing . . . and, by definition, is something that goes beyond
> making the parties whole. The inclusion of fees [for any *pro bono* attorney] borders
> on a punitive award, which is not the intent of the court rule and violates the Smith
> Court's admonition that the court rule "is not designed to provide a form of economic
> relief to improve the financial lot of attorneys or to produce windfalls."

Van Elslander, 297 Mich App at 237. But Morris's circumstances differ from those contemplated

by our Court of Appeals because Morris agreed at the outset of the litigation to pay his attorneys, and

he has acknowledged that he remains bound by that obligation. Accordingly, the Court should not

relieve Attorney Charron of his obligation to bear the cost of Morris's attorney fees.

### III.  Costs

In addition to his claim for attorney fees, Plaintiff Morris has requested costs in the amount

of $14,090.77 and furnished a bill of costs to support that request. See Hearing Exhibit G. Under

Michigan law, the Court "may issue an order to pay compensation for actual loss or injury caused

by a contemnor's misconduct." See *In re* Contempt of United Stationers Supply, Inc, 239 Mich App

496, 500 (2000).  To the extent that the court costs sought by Morris constitute reimbursement for

expenses incurred in conjunction with the contempt proceeding, those costs must be assessed. See

Taylor, 277 Mich App at 102; see also *In re* Contempt of McRipley, 204 Mich App 298, 301-302

10

(1994). Indeed, our Court of Appeals has indicated – albeit in an unpublished decision – that court costs are a recoverable component of damages in a contempt proceeding. See City of Alpena v Tom Shaw, Inc, No 202542 (Mich App June 9, 1998) (affirming "an order in this contempt proceeding imposing court costs against defendant as a civil remedial sanction"). Consequently, the Court shall order Attorney Charron to pay court costs of $14,090.77 to Morris.

## IV. Conclusion

For seven years, this case has wreaked havoc upon nearly everyone involved. As this matter finally draws to a close, two corporate entities are now defunct, Defendant R. Judd Schnoor has gone through bankruptcy proceedings, Plaintiff Morris has run up attorney fees well in excess of a million dollars, his attorneys now carry a receivable in that amount that may never be paid, and the attorney for the defendants has been found in civil contempt of Court and, by this opinion and order, directed to pay $349,416 in attorney fees and $14,090.77 in court costs to Morris. This ruinous litigation now stands as a testament to the folly of all-out warfare in the civil justice system. Mercifully, the Court can finally close this sad chapter with the entry of a judgment. The plaintiffs are hereby invited to submit a proposed judgment, to which any party or contemnor may object within seven days.

IT IS SO ORDERED.


Dated: January 28, 2014

HON. CHRISTOPHER P. YATES (P41017)
Kent County Circuit Court Judge

## EXHIBIT C

## THE FINAL JUDGMENT

STATE OF MICHIGAN
IN THE 17th CIRCUIT COURT FOR KENT COUNTY

GLENN S. MORRIS and THE GLENN S.
MORRIS TRUST,

              Plaintiffs/Counter-Defendants,          Case No. 07-06441-CR

     vs.                                       HON. CHRISTOPHER P. YATES

R. JUDD SCHNOOR and MADCAP
ENTERPRISES, LLC, substituting in for
MORRIS, SCHNOOR & GREMEL, INC.,

              Defendants/Counter-Plaintiffs.
_____/

## FINAL JUDGMENT FOR PLAINTIFF GLENN S. MORRIS
## AND AGAINST ATTORNEY DAVID W. CHARRON

       Pursuant to the Court's Opinion and Order Awarding Attorney Fees to Plaintiff Glenn S. Morris

and against Attorney David W. Charron dated January 28, 2014, IT IS ORDERED that Judgment is

hereby entered against David W. Charron and in favor of Glenn S. Morris in the amount of $363,506.77.

       The foregoing Judgment is to be credited and partially offset by a January 28, 2014, award of

attorneys' fees and costs against Glenn S. Morris and in favor of David W. Charron in 17th Circuit

Court Case No. 09-01878-CB.

       **This Judgment now resolves all remaining issues between the parties and closes the case**

**pursuant to MCR 2.602(A)(3).**

       IT IS SO ORDERED.

Dated: March 7, 2014

                                      _____
                                      HON. CHRISTOPHER P. YATES (P41017)
                                      Kent County Circuit Court Judge

COPY
ATB/S/SIBLE
RECEIVED
MAR 10 2014
BY: 133922-1

**EXHIBIT D**

**THE OFFER OF JUDGMENT OPINION**

STATE OF MICHIGAN
IN THE 17th CIRCUIT COURT FOR KENT COUNTY

GLENN S. MORRIS,

       Plaintiff,

    vs.

MORRIS, SCHNOOR & GREMEL,
INC.; DAVID CHARRON, individually;
CHARRON & HANISCH, P.L.C., a
limited liability company; and NEW
YORK PRIVATE INSURANCE, LLC,

       Defendants.

_____/

Case No. 09-01878-CB

HON. CHRISTOPHER P. YATES

### OPINION AND ORDER AWARDING OFFER-OF-JUDGMENT SANCTIONS

On October 22, 2009, the Court issued an opinion and order that, *inter alia*, granted summary

disposition to Defendant David Charron on all claims against him. Then, on November 19, 2009,

Charron filed a motion seeking $47,196.72 in attorney fees and costs under MCR 2.405(D)(1). In

simple terms, Charron argued that he made a $100.00 offer of judgment, that Plaintiff Glenn Morris

rejected that offer, and that the award of summary disposition in Charron's favor constituted a result

"more favorable to the offeror than the average offer," so "the offeree [*i.e.*, Morris] must pay to the

offeror [*i.e.*, Charron] the offeror's actual costs incurred in the . . . defense of the action." See MCR

2.405(D)(1). Because Michigan law calls for such a sanction even based upon an offer of judgment

for a nominal amount, the Court concludes that Charron is entitled to sanctions from Morris pursuant

to MCR 2.405(D)(1). Accordingly, based upon its review of the statements furnished by Charron,

the Court shall direct Morris to pay Charron $22,443.77 because of Morris's rejection of Charron's

offer of judgment.

## I. Factual Background

The litigation against Defendant Charron arose out of a transfer of assets from an insurance agency known as Morris, Schnoor & Gremel, Inc. ("MSG") to another firm called New York Private Insurance Agency, LLC ("NYPIA"). That transfer was accomplished through a two-step process. Specifically, Charron's law firm – Charron & Hanisch, P.L.C. ("C&H") – acted in its capacity as a secured creditor of MSG in seizing all of the assets of MSG, and then C&H sold those assets to NYPIA. In the wake of that transfer, Plaintiff Morris filed this action challenging the transfer on a host of legal grounds. Morris named Charron in his individual capacity as a defendant.

On February 24, 2009, Defendant Charron made an offer of judgment to Plaintiff Morris in the amount of $100.00. See David Charron's Motion for Imposition of Costs and Supporting Brief, Exhibit 1. On March 16, 2009, Morris rejected Charron's offer of judgment and provided a counter-offer to Charron in the amount of $50,000.00. See id., Exhibit 2. Then, on October 22, 2009, the Court issued an opinion and order that awarded summary disposition to Charron in his individual capacity on all claims. See Opinion and Order Granting in Part, and Denying in Part, Defendants' Motions for Summary Disposition at 10-11. Based upon that ruling, Charron filed a motion seeking offer-of-judgment sanctions of $47,196.72 pursuant to MCR 2.405(D)(1).

## II. Legal Analysis

"'The purpose of MCR 2.405 is "to encourage settlement and to deter protracted litigation."'" Hanley v Mazda Motor Corp, 239 Mich App 596, 603 (2000). According to MCR 2.405(D)(1), if an offer of judgment "is rejected, costs are payable . . .[i]f the adjusted verdict is more favorable to the offeror than the average offer[.]" Here, Plaintiff Morris rejected Defendant Charron's $100 offer

2

and made a counter-offer of $50,000. Thus, the "average offer" in this case is $25,050. <u>See</u> MCR 2.405(A)(3). The Court's award of summary disposition in favor of Charron constitutes "a verdict for purposes of imposing sanctions pursuant to MCR 2.405." <u>See</u> <u>Marilyn Froling Revocable Living Trust</u> v <u>Bloomfield Hills Country Club</u>, 283 Mich App 264, 297 (2009), <u>citing</u> MCR 2.405(A)(4)(c). Because the verdict of no recovery was more favorable to Charron than the average offer of $25,050, Charron appears to be entitled to offer-of-judgment sanctions from Morris under MCR 2.405(D)(1).

Plaintiff Morris concedes that Defendant Charron has met all of the requirements prescribed for an award under the offer-of-judgment rule,[1] <u>see</u> Hearing Tr (April 9, 2013) at 28-29, but Morris nonetheless contends that Charron should be denied any relief under MCR 2.405 because this case presents circumstances that, "in the interest of justice," warrant denial of attorney fees pursuant to MCR 2.405(D)(3).[2] To be sure, MCR 2.405(D)(3) provides that the Court "may, in the interest of justice, refuse to award an attorney fee under this rule." But "'absent unusual circumstances,' the 'interest of justice' does not preclude an award of attorney fees under MCR 2.405." <u>See</u> <u>Luidens</u> v <u>63rd District Court</u>, 219 Mich App 24, 32 (1996). "'The better position is that a grant of fees under MCR 2.405 should be the rule rather than the exception.'" <u>See</u> <u>Derderian</u> v <u>Genesys Health Care Systems</u>, 263 Mich App 364, 390 (2004).

---

[1] In his initial challenge to an award of offer-of-judgment sanctions, Plaintiff Morris took the position that consideration of relief was premature both because the case had not run its course and because of the impending case-evaluation process. But at the hearing on April 9, 2013, Morris gave up both of those arguments because the case had been completed without a case-evaluation process. <u>See</u> Hearing Tr (April 9, 2013) at 25.

[2] To the extent that Plaintiff Morris challenges an award of costs, as opposed to attorney fees, his argument is unavailing. Although MCR 2.405(D)(3) empowers the Court to deny attorney fees to Defendant Charron "in the interest of justice," Charron cannot be denied "actual costs" other than attorney fees. Indeed, "the imposition of 'the costs and fees taxable in a civil action' is mandatory." <u>Castillo</u> v <u>Exclusive Builders, Inc</u>, 273 Mich App 489, 493 (2007).

3

Plaintiff Morris advances two theories for denial of attorney fees to Defendant Charron in the interest of justice under MCR 2.405(D)(3). First, Morris contends that Charron was the principal architect of the misconduct that resulted in a finding of contempt against him in a related case, see Morris v Schnoor, 17th Cir Ct No 07-06441-CR, so an attorney-fee remedy in the instant case would essentially reward his improper conduct. But the Court has entered an opinion and order in that case holding Charron responsible to Morris for $349,416 in attorney fees and $14,090.77 in costs due to his misconduct in that matter, so denial of attorney fees "in the interest of justice" pursuant to MCR 2.405(D)(3) in this case would doubly sanction Charron for his action. Thus, the Court must analyze Charron's demand for attorney fees in the instant case simply based upon his conduct in this matter, which did not begin until months after Charron committed the misconduct that prompted the Court to find him in contempt in the Morris v Schnoor case.

Second, Plaintiff Morris contends that the arguments he made against Defendant Charron for personal liability under the Uniform Fraudulent Transfer Act were either grounded in Michigan law or a novel request for extension of existing Michigan law. An attorney-fee award under the offer-of-judgment rule, however, flows from the failure of one side to reach a settlement and thereby avoid protracted litigation, rather than from the frivolous nature of that side's claims. Compare Reitmeyer v Schultz Equipment & Parts Co, Inc, 237 Mich App 332, 338 (1999) (explaining purpose of MCR 2.405(D)) with MCR 2.114 (prescribing sanctions for frivolous submissions). If Morris had pressed his claims against Charron for the purpose of making important new Michigan law, he could avail himself of the "interest of justice" exception in MCR 2.405(D)(3). See Luidens, 219 Mich App at 36 ("exception would apply 'where the law is unsettled and substantial damages are at issue'"). But in this case, Morris cannot convince the Court that he pressed forward because "there [was] a public

4

interest in having an issue judicially decided rather than merely settled by the parties." <u>See id.</u>  As a result, the Court cannot conclude that, "in the interest of justice," the Court should "refuse to award an attorney fee" to Charron under MCR 2.405(D). <u>See</u> <u>AFP Specialties, Inc</u> v <u>Vereyken</u>, No 306215, slip op at 12-13 (Mich App Jan 2, 2014) (**published** decision stating that "'the reasonableness of the offeree's refusal of the offer, the party's ability to pay, and the fact that the claim was not frivolous "are too common" to constitute the unusual circumstances encompassed by the "interest of justice" exception'"). Instead, the Court must determine how much to award Charron for his "actual costs incurred" in this case. <u>See</u> MCR 2.405(D)(2) & (3).

According to MCR 2.405(A)(6), Defendant Charron's "'actual costs' means the costs and fees taxable in a civil action and a reasonable attorney fee for the services necessitated by the failure to stipulate to the entry of judgment." As a general rule, "all fees incurred after rejection of the offer, or after the time for acceptance has elapsed, must be included." <u>Sanders</u> v <u>Monical Machinery Co</u>, 163 Mich App 689, 694 (1987). Nevertheless, the Court possesses inherent power to determine the reasonableness of the attorney-fee request, <u>see id.</u>, and "[t]here must be a causal nexus between the attorney fees awarded and the rejection of the offer of judgment to qualify as 'necessitated by' the rejection" of the offer of judgment for purposes of MCR 2.405(A)(6). <u>AFP Specialties</u>, No 306215, slip op at 12, <u>citing</u> <u>Castillo</u> v <u>Exclusive Builders, Inc</u>, 273 Mich App 489, 493 (2007).

In setting the "reasonable" attorney-fee award for Defendant Charron, the Court must follow the three-step analysis prescribed in <u>Smith</u> v <u>Khouri</u>, 481 Mich 519, 522 (2008). <u>See, e.g.,</u> <u>Prime Financial Services, LLC</u> v <u>Vinton</u>, No 290735, slip op at 6 n4 (Mich App Jan 6, 2011) (unpublished decision directing consideration of <u>Smith</u> in analysis of reasonable attorney fees under MCR 2.405). First, the Court must determine the "reasonable hourly or daily rate" for each billing attorney. <u>See</u>

Smith, 481 Mich at 522. Fortunately, the parties have stipulated to those rates, so the Court simply

shall rely upon those stipulated rates. See Blue Cross and Blue Shield of Michigan v Eaton Rapids

Community Hospital, 221 Mich App 301, 307 (1997) ("A stipulation is given full force and effect

and is binding upon the parties unless abandoned or disaffirmed."). Second, the Court must decide

"the reasonable number of hours expended" and multiply that number by the hourly rates to obtain

"a baseline figure." See Smith, 481 Mich at 522, 533. Because Plaintiff Morris rejected the offer

of judgment on March 16, 2009, see David Charron's Motion for Imposition of Costs and Supporting

Brief, Exhibit 2, the Court can only award attorney fees from that date through the date on which the

Court granted summary disposition in Charron's favor, i.e., October 22, 2009. Having reviewed the

billing sheets submitted by Charron, which are attached as Exhibit A to Charron's affidavit, see id.,

Exhibit 4, the Court finds that all of the attorney fees claimed by Charron meet the requirements for

an award under MCR 2.405(A)(6) and (D)(2). Therefore, the Court concludes that Charron's "base

number" for an attorney-fee award is $44,539.40.[3] See id. (Exhibit A to Charron affidavit).

    The third and final stage of the Court's analysis involves consideration of adjustments to the

"base number" of $44,539.40 in attorney fees. See Smith, 481 Mich at 522. The Court must weigh

factors such as "'(1) the professional standing and experience of the attorney; (2) the skill, time and

labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5)

the expenses incurred; and (6) the nature and length of the professional relationship with the client.'"

---

[3] Counsel for Plaintiff Morris has furnished the Court with an affidavit that characterizes the billing computation as "not a reasonable assessment of the services provided to Defendant David W. Charron in this case." See Affidavit of Stanley J. Stek in Opposition to David W. Charron's Motion for Imposition of Costs, ¶ 14. The Court agrees with that assessment only with respect to its claim that the fees should be divided equally between Defendant Charron and his law firm, which was also a defendant in the instant case. But in all other respects, the Court disagrees with that assessment and, therefore, accepts Charron's computation of attorney fees.

6

Smith, 481 Mich at 529, quoting Wood v Detroit Automobile Inter-Insurance Exchange, 413 Mich 573, 588 (1982); see also Smith, 481 Mich at 530, quoting MRPC 1.5(a) (listing eight factors). In demanding an adjustment of the "base number," Plaintiff Morris argues that no attorney fees should be awarded because Defendant Charron was represented by attorneys from the law firm in which he was a partner at the time. The Court disagrees.[4] Charron has not requested attorney fees for his own work, even though he devoted a substantial amount of time to defending against this action. Instead, Charron has simply submitted an attorney-fee request for the work of other professionals in his firm who, no doubt, spent hours on Morris's case that they otherwise could have devoted to other paying clients. Accordingly, MCR 2.405(A)(6) authorizes compensation for their work.[5]

Plaintiff Morris further argues that the time spent by Defendant Charron's attorneys on this case actually represents the full scope of their legal endeavors on behalf of two parties – Charron and his law firm, Defendant C&H. Accordingly, Morris contends that the attorney fees Charron claims should be split in half to reflect the fact that two parties benefitted from all of the legal work, yet only one of those parties can request attorney fees pursuant to MCR 2.405 for offer-of-judgment sanctions

---

[4] Plaintiff Morris's challenge in this regard rings especially hollow in light of the fact that he has requested – and, in fact, obtained from the Court – hundreds of thousands of dollars for attorney fees that he has not yet paid. See Opinion and Order Awarding Attorney Fees to Plaintiff Glenn S. Morris and Against Attorney David W. Charron (Jan 28, 2014) in Morris v Schnoor, 17th Cir Ct No 07-06441-CR.

[5] In reaching this conclusion, the Court acknowledges that our Court of Appeals has refused to approve "that portion of [an] award of attorney fees that compensated defendant-attorney for the time he or his staff spent defending against this claim." See Watkins v Manchester, 220 Mich App 337, 345 (1996). The concern of our Court of Appeals there, however, focused upon the fact that "an attorney acting in pro se was not an 'attorney' for purposes of the mandatory statutory fee award" because "the terms 'pro se' and 'attorney' were mutually exclusive." See id. at 343, citing Laracey v Financial Institutions Bureau, 163 Mich App 437, 445 (1987). Here, Defendant Charron – as the party to this lawsuit – has not sought compensation for attorney fees for his own work on this case, so an award of attorney fees here will not reward him for pro se litigation.

7

in this case.  The Court agrees.  Although Charron no doubt would have incurred all of the legal fees

he claims regardless of whether his law firm had also been named as a party, the failure to make such

an adjustment would yield a windfall to the law firm by effectively permitting the law firm to take

a free ride on Charron's attorney fees.  That windfall cannot be justified in light of the outcome of

this case, which included a finding that the law firm violated the Uniform Fraudulent Transfer Act,

MCL 566.34(1)(a).  See Findings of Fact, Conclusions of Law, and Verdicts at 13 (Dec 27, 2012).

Thus, the Court shall divide the base number for an attorney-fee award of $44,539.40 in two to arrive

at a final attorney-fee award of $22,269.70.

In addition to attorney fees, Defendant Charron is entitled to "the costs and fees taxable in

a civil action" under the offer-of-judgment rule.  See MCR 2.405(A)(6); Castillo, 273 Mich App at

493.  Charron has submitted a request for $2,657.32 in costs, but the bulk of that amount comprises

charges for "Westlaw usage."  See David Charron's Motion for Imposition of Costs and Supporting

Brief, Exhibit 4 (Exhibit A to Affidavit of David W. Charron).  Although the Court finds Westlaw

indispensable to its own work, Westlaw charges plainly do not constitute allowable court costs.  See

LaVene v Winnebago Industries, 266 Mich App 470, 480 (2005) (identifying "Westlaw research"

as "not taxable under" Revised Judicature Act provisions for taxation of costs).  Consequently, the

Court must deduct from Charron's request for costs $2,483.25 in Westlaw charges, leaving $174.07

in costs to which Charron is entitled.

### III.  Conclusion

Based upon the Court's analysis in this opinion and order, Plaintiff Morris is directed to pay

$22,269.70 in attorney fees and $174.07 in court costs to Defendant Charron pursuant to the offer-of-

8

judgment rule, MCR 2.405. For all practical purposes, the sum of those two figures, *i.e.*, $22,443.77,

serves as an offset against the larger award of attorney fees and costs in favor of Morris and against

Charron in <u>Morris</u> v <u>Schnoor</u>, 17th Cir Ct No 07-06441-CR, where the Court has issued an opinion

and order awarding attorney fees to Morris and against Charron.

      IT IS SO ORDERED.

Dated: January 28, 2014

HON. CHRISTOPHER P. YATES (P41017)
Kent County Circuit Court Judge

**EXHIBIT E**

**THE RESTRAINING ORDER**

STATE OF MICHIGAN
IN THE 17th CIRCUIT COURT FOR KENT COUNTY

GLENN S. MORRIS,

          Plaintiff/Counter-Defendant,

                                      Case No. 07-06441-CR

    vs.

                                        HON. CHRISTOPHER P. YATES

R. JUDD SCHNOOR and MORRIS,
SCHNOOR & GREMEL, INC.,

          Defendants/Counter-Plaintiffs.

_____/

## ORDER DIRECTING DEFENDANTS TO PRODUCE FINANCIAL STATEMENTS

      For the reasons stated on the record at a hearing held on August 20, 2008, IT IS ORDERED that Defendants R. Judd Schnoor and Morris, Schnoor & Gremel, Inc., shall produce to Plaintiff Glenn S. Morris unaudited financial statements of Morris, Schnoor & Gremel, Inc. by August 22, 2008. The unaudited financial statements must provide a summary of the general ledger that has been provided as part of the discovery process. IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall produce to Plaintiff Glenn S. Morris all of the personal financial information described during the court hearing by August 22, 2008. IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall not transfer assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court.

      IT IS SO ORDERED.

Dated: August 22, 2008

                                    _____
                                    HON. CHRISTOPHER P. YATES (P41017)
                                    Kent County Circuit Court Judge

# EXHIBIT F

## ASSET PURCHASE AGREEMENT



## ASSET PURCHASE AGREEMENT

THIS AGREEMENT is made as of the 7th day of November, 2008 by and between Charron & Hanisch, PLC, a Michigan professional limited liability company, of 4949 Plainfield Ave, NE, Grand Rapids, Michigan 49525 ("Seller") and New York Private Insurance Agency, LLC, a Michigan limited liability company of 170 Marcell Drive, NE, Rockford, MI 49341 ("Buyer").

### Background

Buyer desires to purchase, and Seller desires to sell to Buyer, all of that property owned by Morris, Schncor and Gremmel, Inc. ("MSG" or the "company"), in which Seller has a security interest, as more particularly described on the attached **Exhibit A** (the "Property"), pursuant to the provisions of this Agreement.

### Agreement

For valuable consideration, the receipt of which is hereby acknowledged, Seller and Buyer agree as follows:

1       *Property Purchased.*  Seller agrees to sell and Buyer agrees to buy the Property at a private sale, duly noticed under MCL 440.9611.

2.      *Liabilities Assumed.*  Seller agrees that Buyer assumes no liabilities of any kind of Seller.  The assets being purchased are subject to a security interest in favor of Fifth Third Bank which secures a commercial line of credit of MSG (maximum amount is $400,000), and contains a due on sale clause. Seller agrees to assume or otherwise make arrangements to pay such obligation to Fifth Third Bank independently of this agreement. The purchase price of this agreement is not reduced by any MSG liabilities to Fifth Third Bank which are assumed or paid by Buyer.

3.      *Purchase Price.*  The total purchase price for the Property is Three Hundred Ninety Five Thousand Dollars ($395,000.00) (the "Purchase Price").  Buyer may pay the entire amount in cash or by cash equivalent at the time of Closing.  Alternatively, Buyer may pay a minimum of One Hundred Thousand Dollars ($100,000) of the Purchase Price at Closing and finance the balance by delivering to Buyer a promissory note payable in equal monthly installments, with a 10 year amortization and 5 year balloon, and simple interest at seven (7) percent per annum.  If a note is delivered, Buyer will also grant Seller a security interest in all of the assets of Buyer and Seller will subordinate such interest to the security interest of Fifth Third Bank.  All loan documents shall be in a commercially reasonable form which is mutually acceptable to the parties.

4.      *Title/Possession.*  Seller shall deliver title to the Property at the time of Closing, by delivery to Buyer of the bill of sale attached hereto as **Exhibit B**.  Buyer shall take title to the Property subject to the security interests of Fifth Third Bank and Buyer shall obtain possession of the Property at the time of Closing from MSG.

EXHIBIT
397

5.    **Condition of Property** The Property is sold and Buyer agrees to accept the Property in its "as-is" condition and "with all faults". Seller makes no warranties about the condition of the Property (express or implied) and all implied warranties of merchantability or fitness for a particular purpose are hereby disclaimed, to the broadest extent of the law.

6.    **Closing.** The closing of the sale of the Property (the "Closing") shall take place at a mutually convenient date, place and time and shall be effective as of that date (the "Closing Date"), but in no event shall the Closing occur later than November 21, 2008 at 10 a.m. The Seller's obligation to close this transaction is contingent upon there being no greater bidder for the assets at the time of the sale to whom Buyer is obligated to sell the Property under Article 9 of the UCC. If another bidder purchases the assets, Seller shall promptly return the deposit to Buyer and thereafter, neither party shall have any further obligations hereunder.

7.    **Miscellaneous Provisions.**

7.1    **Notices.** All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed given (a) when personally delivered or sent by facsimile transmission to the party to be given the notice or other communication or (b) on the business day following the day such notice or other communication is sent by overnight mail to the parties at their respective addresses set forth in the introductory paragraph of this Agreement.

7.2    **Parties in Interest.** This Agreement shall inure to the benefit of, and be binding on, the named parties and their respective successors and permitted assigns, but not any other person.

7.3    **Choice of Law.** This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of Michigan.

7.4    **Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if the signature on each counterpart were on the same instrument.

7.5    **Entire Agreement.** This Agreement and all related documents, schedules, exhibits, or certificates represent the entire understanding and agreement between the parties with respect to the subject matter and supersede all prior agreements or negotiations between the parties. This Agreement may be amended, supplemented, or changed only by an agreement in writing that makes specific reference to this Agreement or the agreement delivered pursuant to

2

it and that is signed by the party against whom enforcement of any such amendment, supplement or modification is sought.

8. *Dispute Resolution*

8.1    Any controversy or claim between the parties arising out of or related to this Agreement, or the breach thereof may, at the option of any party, be settled by arbitration which shall be conducted by either the West Michigan chapter of the Better Business Bureau or the American Arbitration Association, under their respective rules which are then in effect. Arbitration of any claim or controversy arising out of or relating to this Agreement or the breach thereof must be filed within such time as would be permitted by law for the filing of a suit on such claim in any Court, and, any arbitration which is filed late shall be dismissed and, if not dismissed, the late filing may be presented as a defense in any suit to enforce the arbitration award.

8.2    Each party to this Agreement specifically agrees, by signing this Agreement, or by otherwise becoming subject to it, that it is giving up any right to file suit and have a trial by a judge or a jury of any claim or controversy arising out or relating to this Agreement or the breach thereof (other than the failure to pay for an approved cost or expense and except for any suit to enforce an arbitration award) and that said parties are agreeing to provisions of this Agreement freely and voluntarily. The award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

The parties have executed this Agreement effective on the date set forth on the first page of this Agreement.

SELLER:

CHARRON & HANISCH, PLC, a Michigan professional limited liability company

By: _____
David W. Charron
Its: Manager

BUYER:

NEW YORK PRIVATE INSURANCE AGENCY, LLC, a Michigan limited liability company

By: _____
William Woodworth
Its: Member

3

## EXHIBIT A

## DESCRIPTION OF PROPERTY

All of the assets of Morris, Schnoor and Gremmel, Inc., including without limitation, all membership interests in GH Insurance Agency, LLC, and Rockford Insurance Agency, LLC, the assumed names "MSG Associates", "MSG Insurance Agency" and "Morris, Schnoor & Gremel", all customer and insurance accounts, furniture, equipment, furnishings, software (including but not limited to Agencyware software), all contents of Morris, Schnoor and Gremmel's current office, all other personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including property and casualty, liability, health and benefit accounts, and health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles), and all other names of the company, as well as phone numbers, and domain names of the company, and all claims and awards in the causes of action presently pending in Kent County Circuit Court Case No. 07-06441-CR, Morris v. Schnoor, et. al.

## EXHIBIT G

## BILL OF SALE

## BILL OF SALE

Date: November 21, 2008

Charron & Hanisch, PLC, a Michigan professional limited liability company, of 4949 Plainfield Avenue NE, Grand Rapids, MI 49525 ("Seller"), in consideration of the sum of Three Hundred Ninety Five Thousand Dollars ($395,000.00) paid by the Buyer signing below, the receipt for which is hereby acknowledged, has sold to New York Private Insurance Agency, LLC, a Michigan limited liability company of 170 Marcell, NE, Rockford, MI 49341 ("Buyer"), all title and interest that Seller has, if any, in and to the following described property formerly owned by Morris, Schnoor & Gremmel, Inc. d/b/a Morris Schnoor & Gremel ("Debtor"), pledged to the Seller by the Debtor under a Security Agreement dated May 22, 2008, as amended, and sold to Buyer at a duly noticed private sale pursuant to MCL 440.9610(1):

All of the assets of Morris, Schnoor and Gremmel, Inc., including without limitation, all membership interests in GH Insurance Agency, LLC, and Rockford Insurance Agency, LLC, the assumed names "MSG Associates", "MSG Insurance Agency" and "Morris, Schnoor & Gremel", all customer and insurance accounts, furniture, equipment, furnishings, software (including but not limited to Agencyware software), all contents of Morris, Schnoor and Gremmel's current office, all other personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including property and casualty, liability, health and benefit accounts, and health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles), and all other names of the company, as well as phone numbers, internet addresses and domain names of the company, and all claims and awards in the causes of action presently pending in Kent County Circuit Court Case No. 07-06441-CR, Morris v. Schnoor, et. al.

NO WARRANTIES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY THE SELLER IN REFERENCE TO THE PROPERTY DESCRIBED ABOVE. THE SELLER, CHARRON & HANISCH, PLC MAKES NO WARRANTIES OF TITLE, POSSESSION, QUIET ENJOYMENT, OR MERCHANTABILITY OF THE PROPERTY OR OF THE FITNESS OF THE PROPERTY FOR ANY PURPOSE. THE PROPERTY IS BEING ACCEPTED BY THE BUYER IN AN "AS IS" CONDITION, AND IS ACCEPTED BY THE BUYER "WHERE IS."

SELLER:

CHARRON & HANISCH, PLC,, a Michigan
professional limited liability company

By _____
David W. Charron, Manager

BUYER:

NEW YORK PRIVATE INSURANCE AGENCY,
LLC, a Michigan limited liability company

By: _____
William Woodworth, Member

EXHIBIT
415

## EXHIBIT H

## CERTIFICATE OF DISSOLUTION OF CHARRON & HANISCH, P.L.C

# *Michigan Department of Licensing and Regulatory Affairs*

## *Filing Endorsement*

This is to Certify that the CERTIFICATE OF DISSOLUTION

*for*

CHARRON & HANISCH, P.L.C.

ID NUMBER: B22607

received by facsimile transmission on December 27, 2012 is hereby endorsed

Filed on December 28, 2012 by the Administrator.

The document is effective on the date filed, unless a
subsequent effective date within 90 days after
received date is stated in the document.



In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 28TH day
of December, 2012.

Director

Bureau of Commercial Services

Sent by Facsimile Transmission 12363

Dec. 27. 2012  3:09PM                                    No. 2957   P. 2

BCS/CD-731 (Rev. 04/11)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## BUREAU OF COMMERCIAL SERVICES

| Date Received | (FOR BUREAU USE ONLY) |
|---|---|
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document. |

Name
David W. Charron

Address
4949 Plainfield NE

City                State              Zip Code
Grand Rapids    MI              49525          EFFECTIVE DATE:

☞ Document will be returned to the name and address you enter above. ☜
If left blank document will be mailed to the registered office.

## CERTIFICATE OF DISSOLUTION
## For use by Limited Liability Companies
(Please read information and instructions on reverse side)

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned limited liability company executes the following Certificate of Dissolution:*

1. The name of the limited liability company is:  **Charron & Hanisch, P.L.C.**

2. The identification number assigned by the Bureau is:    B22607

3. The reason for the dissolution is:  (check only one)
   ☐ upon the happening of an event specified in the Articles of Organization or operating agreement.
   ☑ upon unanimous vote.

4. (Complete only if an effective date other than the date of filing is desired.  This date must be no more than 90 days after receipt of this document by the administrator.)

This Certificate is hereby signed as required by Section 103 of the Act.

Signed this  27th   day of  December              2012

By _____
(Signature of Member, Manager, or Authorized Agent)

David W. Charron, Manager
(Type or Print Name and Capacity)